[No. B041907. Second Dist., Div. Seven. July 6, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
ARTHUR PENA, Defendant and Appellant.

**COUNSEL**

William E. Moore, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, Keith H. Borjon and Donald J. Oeser, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WOODS (Fred), J.**—Arthur Samuel Pena (appellant) appeals from a judgment of conviction, following a jury trial, for burglary, forcible rape and forcible oral copulation. We affirm the judgment.

### FACTS AND PROCEEDINGS BELOW

The victim, Ms. Helen B., is a woman in her late 50's who is hearing impaired. She testified with the help of a sign-language interpreter. Ms. B. testified she had seen appellant twice before the rape, once at a neighbor's yard sale, and again a week or month before the incident when appellant drove by her home and told her, "I'm gonna get you. I'm gonna fuck you."

On June 27, 1988, about 2:30 p.m. Ms. B. was unlocking the door of her home when appellant approached her from behind carrying a cup. He said something about "water" and pushed her into her home and onto a rollaway bed in her living room where he raped her. Subsequently, appellant got off of her, twisted her by the legs violently, and orally copulated her.

After the incident, Ms. B. drove to her sister's home and told her she had been raped. She then went to see her regular physician, Dr. Singer. Ms. B. first testified the doctor was in a hurry and she did not have a chance to tell him what happened. Later, she testified she was examined by Doctor Singer and told him she was raped. She could not remember many details about the examination.

When she returned home that day, she took a shower and douched. She told her son, an ordained minister, her neighbor, Denise Stratton, and Detective Lee of the Culver City police department she was attacked but not raped. She was too embarrassed to tell them she had been raped. Detective Lee showed Ms. B. a photographic lineup. She identified appellant immediately.

The next day, Ms. B. admitted to Ms. Stratton she was actually raped by the appellant. Ms. Stratton contacted Detective Lee, who suggested Ms. B. be seen by a doctor. Ms. B. saw Dr. Robinson that day.

Dr. Robinson examined her with a "rape kit" the day after the incident. He testified the victim had bruises and vaginal redness consistent with a rape. He found no evidence of semen during his examination, but testified none would be found if the victim showered and douched before the examination.

Detective Lee reinterviewed Ms. B. after her visit with Dr. Robinson. He also noticed several bruises on her arms and legs, and ordered photographs

to be taken. During the investigation, a cup was recovered from the premises. No useful fingerprints were recovered from the cup or from Ms. B.'s home which would have placed appellant at the scene.

Connie Faught and Denise Stratton took the stand and corroborated those aspects of Ms. B.'s encounter in which they were involved. Ms. Stratton further testified she knew appellant for nine months prior to the incident. She witnessed the appellant drive by Ms. B.'s home shouting "I'm gonna fuck you." On the morning of the rape, appellant went to Ms. Stratton's home seeking repayment of $20 he had loaned her. Ms. Faught added she saw bruises on Ms. B.'s body the day after the rape.

Appellant testified on his own behalf. He claimed he had met Ms. B. a few months before the incident, through her boyfriend "Jerry." He went to Ms. Stratton's home on the morning of June 27th to get $20 she owed him. Appellant went to Ms. B.'s home later that afternoon to discuss renting a room in her home. He admitted having sex with Ms. B., but contended the act was consensual. He testified the victim became angry with him after the sexual act because he refused to move in and pay the rent she was asking. Appellant also insinuated Ms. B. was asking for money in return for the sex they just had.

The defense also offered the testimony of Dr. Singer, Ms. B.'s regular physician. Dr. Singer testified he examined Ms. B. on the day of the incident. Ms. B. indicated she had been raped, but did not tell him when it occurred. Dr. Singer conducted a vaginal examination, and diagnosed redness and irritation. He prescribed medication for a vaginal infection. He did not use a rape kit, nor did he check Ms. B.'s body for bruises.

On March 7, 1989, the jury returned a verdict of guilty on all three counts. The court imposed sentence of eight years for the rape count and eight years for the forcible oral copulation count, ordering the two terms to run consecutively. Appellant was also sentenced to the high base term of six years on the burglary count, to run concurrently with the sentence imposed on the sex crimes.

Appellant appeals from the judgment of conviction.

DISCUSSION

I. *The Trial Court Did Not Err in Refusing Appellant's Request for Cocounsel Status.*

On the morning of trial appellant requested cocounsel status, stating: "Your honor, I thought this over, and I feel it's my best interest, possibly

[defense counsel's], that I ask the court for co-counsel status. I believe the court was aware I was Pro Per at one time." The court denied appellant's request stating appellant's prior propria persona status "would not be the basis for co-counsel status." ■ Appellant asserts the trial court erred in denying his request.

As long as a defendant is represented by counsel at trial, he has no absolute right to participate personally in his own defense. (*People* v. *Mattson* (1959) 51 Cal.2d 777, 789 [336 P.2d 937].) While the Sixth Amendment guarantees both the right to self-representation and the right to counsel, a defendant who elects representation by counsel does not have a constitutionally protected right to appear as cocounsel. (*People* v. *Bloom* (1989) 48 Cal.3d 1194, 1218 [259 Cal.Rptr. 669, 774 P.2d 698]; *People* v. *Hamilton* (1989) 48 Cal.3d 1142 [259 Cal.Rptr. 701, 774 P.2d 730].) The court may exercise its discretion and permit a defendant to actively participate in the presentation of his case. But it grants that request on a substantial showing the cause of justice would be served and the "orderly and expeditious conduct of the court's business" would not be substantially hindered. (*Mattson, supra*, at p. 797.)

Appellant contends the trial court applied an erroneous legal standard when exercising its discretion to grant or deny his request. The argument is convoluted but it appears he is arguing the following: to properly exercise its discretion, a trial court must determine whether the defendant has made a substantial showing of the need for and effect of acting as cocounsel. By stating simply propria persona status was not a basis for cocounsel status, the court failed to make the required determination, thereby applying the wrong legal standard in its ruling.

Appellant relies on *People* v. *Davis* (1984) 161 Cal.App.3d 796 [207 Cal.Rptr. 846], for the proposition a trial court abuses its discretion in ruling on a cocounsel request when it labors under a misunderstanding of law. In *Davis*, defendant made an extensive showing of his need for cocounsel status. He was an attorney with extensive experience in civil and criminal practice. He had particular expertise with respect to the case which counsel did not possess. He had a close understanding of the facts of the case and had prepared for the cross-examination of a key prosecution witness since the inception of the case. Furthermore, there was nothing in the record to indicate any disruption or delay would have occurred.

The Court of Appeal held the magistrate misunderstood his discretion to rule on the matter, and thereby erred in refusing defendant's request to cross-examine the witness. The magistrate in *Davis* was "either unaware he

had the discretion to allow the respondent personally to cross-examine the prosecution's witness, [citations] or even if aware, [was] misguided as to the appropriate legal standard to guide the exercise of this discretion." (*Davis, supra,* 161 Cal.App.3d at p. 802.) The magistrate based his denial solely on the fact defense counsel was adequate. The record did not reveal the magistrate understood he should consider the interests of justice or the lack of delay when reviewing the request. Thus, the court held the magistrate failed to give "the necessary consideration to all the material facts and evidence of this particular case as is required for a proper exercise of discretion." (*Id.* at p. 805, italics omitted.)

Appellant's reliance on *Davis* is misplaced. In *Davis* the defendant had made a substantial showing the interests of justice would be served by granting him cocounsel status. Thus, *Davis* concerns the proper exercise of discretion where a defendant has made the required substantial showing in support of his request.

Where, as here, a defendant fails to show cocounsel status would serve the interests of justice and would not result in substantial disruption, there is no basis for the exercise of the court's discretion, and the motion is properly denied. (*People* v. *Hamilton, supra,* 48 Cal.3d at p. 1162.) The burden is on the defendant to make the requisite showing. A trial court is not required to inquire further into the matter where the defendant has not first offered the "substantial showing." (See e.g., *Hamilton, supra,* 48 Cal.3d 1142; *People* v. *Andrews* (1989) 49 Cal.3d 200 [260 Cal.Rptr. 583, 776 P.2d 285]; *People* v. *Miranda* (1988) 44 Cal.3d 57 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Moore* (1988) 47 Cal.3d 63 [252 Cal.Rptr. 494, 762 P.2d 1218] [denials of cocounsel requests proper where trial courts did not inquire into the reasons for defendants' requests, and defendants failed to first make substantial showing].)

Thus, in *People* v. *Andrews, supra,* 49 Cal.3d 200, denial of cocounsel status was held proper where defendant simply made a written request to assist in pretrial motions and trial strategy, and locate and contact various defense witnesses. The court stated:

"Defendant offered no explanation of how a grant of cocounsel status would have enhanced his ability to assist in developing trial strategy and locating witnesses. Nor did he explain how increasing his access to the law library would in any way benefit his defense. He was represented by two attorneys who both participated extensively at trial, and he made no attempt to explain why they could not do the necessary legal research. Defendant has failed to make a substantial showing that granting him cocounsel status

would have been in the interest of justice and judicial efficiency. Therefore, 'there was no basis for exercise of the court's decision,' and denial of the motion was proper." (*Id.* at p. 220; See also *People* v. *Moore, supra,* 47 Cal.3d 63 [defendant who claimed inadequate representation and expressed desire to control tactical decisions, failed to make the requisite "substantial showing"].)

Appellant similarly failed to show justice would be served and the trial would not be substantially disrupted by the granting of his last minute request. He did not attempt to explain how he could assist his attorney in the presentation of his case. Appellant did not contend his appointed counsel could not handle the case effectively. He stated simply: "I thought this over, and I feel it's my best interest, possibly Mr. Purcell's [defense counsel's], that I ask the court for co-counsel status." While he contends on appeal he could have assisted in his defense if allowed to cross-examine the victim, he did not offer this rationale in the trial court.

Because appellant failed to offer any legally cognizable justification for his request for cocounsel status and further failed to demonstrate the cause of justice would be served, we conclude the trial court did not err in denying appellant's request for cocounsel status.

## II. *The Trial Court Erred in Refusing Appellant's Pretrial Request to Change Into Civilian Clothes, but the Error Does Not Warrant Reversal in the Circumstances of the Case.*

Before the jury panel arrived in the courtroom for voir dire, defense counsel stated, "As the court recalls in the morning, things were a little heated in here. Mr. Pena was requesting the opportunity to go downstairs, get some clothing before trial commences." The trial judge replied, "We have been out here for the last 15 minutes. If he just made this request now, that is denied. The jury is coming in." Appellant contends the trial court committed constitutional error by refusing his request to wear civilian clothes. We agree.

 It is a well-established principle of constitutional law a "[s]tate cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes." (*Estelle* v. *Williams* (1976) 425 U.S. 501, 512 [48 L.Ed.2d 126, 135, 96 S.Ct. 1691]; *People* v. *Taylor* (1982) 31 Cal.3d 488, 494 [183 Cal.Rptr. 64, 645 P.2d 115].) Such compulsion violates a defendant's right to due process and a fair trial, by undercutting the presumption of innocence which inures to all criminal defendants before a finding of guilt beyond a reasonable doubt.

(*Estelle, supra,* at p. 504; *Taylor, supra,* at p. 494.) "The rule is grounded upon the presumption the finder of fact will be influenced adversely by viewing the defendant throughout the trial in garb which constantly suggests his need for incarceration." (*People* v. *Hetrick* (1982) 125 Cal.App.3d 849, 856 [178 Cal.Rptr. 303] (dis. opn. of Froehlich, J.).)

Requiring a defendant to be tried in jail clothing also impinges on notions of equal protection because the practice "operates usually against only those who cannot post bail prior to trial." (*Estelle, supra,* 425 U.S. at p. 505 [48 L.Ed.2d at p. 131]; see also *Taylor, supra,* 31 Cal.3d at p. 495) "A defendant who can afford bail appears for trial in the best array he can muster. He may be a veritable satyr clad like Hyperion himself. Imposition of jail clothing on a defendant who cannot afford bail subjects him to inferior treatment. He suffers a disadvantage as a result of his poverty. Our traditions do not brook such disadvantage." (*People* v. *Zapata* (1963) 220 Cal.App.2d 903, 911 [34 Cal.Rptr. 171].)

### A. Appellant's Request to Be Tried in Civilian Clothes Was Timely and Should Not Have Been Refused.

While the right to be tried in civilian clothing is constitutionally based, it may be waived by a defendant's failure to timely object or otherwise bring the matter to the attention of the court. (*Estelle, supra,* 425 U.S. at pp. 512-513 [48 L.Ed.2d at pp. 135-136]; *Taylor, supra,* 31 Cal.3d at p. 495.) First, a defendant must express his or her objection to wearing prison garb. Courts may not presume a defendant wants to wear civilian clothes, in the absence of an objection, because defense counsel may choose as a matter of trial tactics to have the defendant tried in prison clothing. Secondly, the request for civilian clothes must be timely. The "timeliness" requirement exists to allow a "court to remedy the situation before any prejudice accrues." (*Taylor, supra,* 31 Cal.3d at p. 496.)

Respondent argues appellant waived his right to wear civilian clothing because his request was not made at the beginning of the day's proceedings but just before prospective jurors were brought into the courtroom, and was therefore untimely.

No court has yet identified a specific demarcation point between timely and untimely requests for civilian clothes. All courts addressing the "timeliness" issue have approached it pragmatically—requiring the request to be made before any real prejudice can flow from the defendant's appearance. (See *Taylor, supra,* 31 Cal.3d at p. 496; *Hetrick, supra,* 125 Cal.App.3d at p. 856 ["Very good reasons exist for requiring counsel affirmatively to object to

the clothing his client wears before its use may be deemed error." (dis. opn. of Froehlich J.)].)

Thus, under this utilitarian view, a "timely" request is one made before the defendant is seen by the jury in prison clothes. (See *Taylor, supra,* 31 Cal.3d at p. 491 [defendant's request in chambers made before he was seen by the jury in prison clothes was considered timely.]; *Hetrick, supra,* 125 Cal.App.3d at p. 852 [defendant's request made one hour before jury voir dire began was considered timely.]) For it is only when the jury members see the defendant stripped of his "cloak of innocence" that prejudice can flow from his appearance.

Accordingly, the court in *People* v. *Du Bose* (1970) 10 Cal.App.3d 544 [89 Cal.Rptr. 134], stated: "Manifestly, if the application is to serve any useful purpose, it should have been made before the trial begins. If, in fact, appellant believed he would be prejudiced before the jury because of his jail clothing, he should have requested the court's aid before the jury had seen him dressed in it." (*Id.* at p. 549; *accord People* v. *Hernandez* (1980) 100 Cal.App.3d 637, 646 [160 Cal.Rptr. 607].) Likewise, in *Taylor,* the court noted "granting the request on the second day of trial would have been of questionable value to defendant because his earlier request had been denied and the jury had already seen him in jail clothes." (*Taylor, supra,* 31 Cal.3d at p. 498.)

■ Under this pragmatic approach, it appears appellant exercised his right to wear civilian clothes in a timely fashion. He requested his civilian clothes just before the jury entered the courtroom for voir dire. Appellant therefore objected to his appearance before the jury could have drawn negative inferences from his prison attire. Furthermore, the record reflects appellant's clothes were in the court building. Thus, the request would likely have caused only a slight delay of trial. (See *Taylor, supra,* 31 Cal.3d at pp. 496-497.)

We conclude the trial court committed constitutional error by denying appellant's timely request to be tried in civilian clothes.

B. *The Trial Court's Error in Refusing Appellant's Request for Civilian Clothes Was Harmless Beyond a Reasonable Doubt.*

■ Before a federal constitutional error can be held harmless, the court must be able to declare it was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].) This standard has been held to apply to a trial court's error

in refusing a criminal defendant's request for civilian clothing. (*Taylor*, *supra*, 31 Cal.3d at p. 499.)

Appellant contends the trial court's error was not harmless beyond a reasonable doubt because his conviction turned on the credibility of witnesses, and because he was twice identified by witnesses by his blue prison uniform.

Appellant cites *People* v. *Taylor*, *supra*, in support of this analysis of error. In *Taylor*, the court held forcing the defendant to wear prison garb was reversible error. In finding the error prejudicial, the court relied heavily on the fact defendant's conviction turned on witness credibility. The court noted: "[t]he highly contested facts of the underlying homicide demonstrate that the jury was squarely confronted with the problem of credibility of witnesses." (*Taylor*, *supra*, 31 Cal.3d at p. 500.) The court also found it relevant defendant was identified in court specifically by his jail clothing. Two prosecution witnesses emphasized defendant's in-custody status by identifying the defendant as "wearing blue county clothes," and a "blue jail suit."

In *Taylor* resolution of the defendant's guilt or innocence hinged on the contradictory testimony of two key witnesses. *Taylor* involved a prosecution for murder. An argument broke out between Taylor, Blanco, and the victim, Motto, during a gathering in which several men were smoking "PCP." Motto apparently threatened Blanco with a gun he had in his waistband. According to Blanco, the chief prosecution witness, he walked away when Motto threatened him, only to turn around to see Taylor rush Motto with a knife. Motto blocked the knife with his arms, but Taylor ultimately stabbed Motto. A physician who performed the autopsy testified there were nonfatal wounds on the victim's arms consistent with someone trying to protect himself.

The defendant testified he grabbed Motto's wrists to prevent him from shooting Blanco when Blanco's hand came over his shoulder and stabbed Motto. Defendant's version was not inconsistent with the testimony of the medical examiner relating to the nature of the stab wounds. Cox testified he saw defendant slam the victim against the stove, but that defendant's hands were empty. Both Taylor and Blanco testified Motto pointed to *Blanco* before he died and said "why did you do me wrong?"

In the case at bar, the evidence is not so evenly balanced. It is true appellant's version of the facts directly contradicts that of the victim. If the evidence consisted *solely* of the oral testimony of Ms. B. and the accused, the facts would indeed be "highly contested." In such a case where the

evidence consisted solely of differing versions of the same event, we could not hold beyond a reasonable doubt appellant's appearance had no prejudicial effect on the jury.

But that was not the state of the evidence before the jury in this case. Ms. B.'s account of the event was corroborated both by the testimony of others and by the physical evidence. While no person actually witnessed the rape, various witnesses testified to Ms. B.'s actions following the incident. On the day of the incident, Ms. B. rushed to her sister's home, visibly upset, and told her she was raped. Still upset, she then went to Dr. Singer's office, told him she was raped, and submitted to a physical examination. When she returned home, she allowed her son to contact the police. It is true on that day Ms. B. told her son, the police and Ms. Stratton she was only "attacked." However, it is not inconsistent with the occurrence of rape that a victim is too embarrassed and humiliated to admit the forcible sexual contact.

On the following day, Ms. B. admitted she was actually raped. At the direction of Officer Lee, Ms. B. submitted to another physical examination. She permitted both Dr. Robinson and the police to photograph her body to memorialize the evidence of bruises.

The evidence of bruises those photographs ultimately revealed, as well as the evidence of vaginal redness, is consistent with a forced, and not consensual, sexual encounter.

Appellant's testimony, on the other hand, was both farfetched and almost entirely uncorroborated. Ms. Stratton testified appellant had indeed visited her home on the morning of the incident, seeking repayment of $20. However, no witnesses came forward on appellant's behalf to verify appellant had known Ms. B. for a few months prior to the incident as he claimed.

Of equal importance is the fact appellant failed to explain away the physical evidence of Ms. B.'s bruises during the course of his testimony. He did not claim the allegedly consensual sexual encounter was also consensually "rough sex." Appellant testified there was no biting or scratching during the encounter, and he never had to push her on the bed. Neither did he claim to have seen preexisting bruises during the sexual encounter, which he presumably could have seen if, as he testified, the two were having consensual sex for ten minutes. Appellant expressly testified he did not notice bruises while the two were having sex. Thus, he provided *no* testimony, much less compelling testimony, to explain away the victim's bruises.

Most importantly, appellant cannot successfully claim his attire played a decisive role in damaging his credibility in front of the jury. Appellant

destroyed his own credibility through his violent outbursts in court. The record reveals appellant slammed books and used profanities during jury voir dire. Appellant also interrupted the prosecutor's closing argument, screaming "This is bullshit!" (This disruptive conduct is discussed in more detail at pages 1309-1310 *post*.) If indeed appellant's credibility was damaged, it more likely resulted from his courtroom behavior than from his appearance in prison clothes.

Moreover, appellant here was not identified by his "jail suit" or his "county clothes." He was identified once as the man in "blue," and again as the man in a "blue jumpsuit." Thus, unlike the case in *Taylor*, the witnesses here did not emphasize appellant's in-custody status by mentioning "prison" "county," or "jail" when identifying appellant by his clothes. They simply described the color and style of his clothes.

In light of the strong testimonial and physical evidence of appellant's guilt, and appellant's own disruptive behavior in the courtroom, we conclude any effect appellant's appearance had upon the jury was harmless beyond a reasonable doubt.

### III. *The Trial Court Did Not Abuse Its Discretion in Excluding Appellant From the Courtroom.*

During closing argument, the prosecutor stated sarcastically, "reward [the appellant] for picking the victim, a woman who cannot hear, who cannot communicate properly, who cannot come in here and tell you what she really feels. . . . Reward him for picking a victim who's too embarrassed and humiliated to say something in front of her son, which has been ordained a . . . a man of the cloth." Appellant then interrupted the prosecutor's argument stating "That man was not ordained." The court stated "Mr. Pena." Appellant continued his outburst stating, among other things, "No, I won't shut up anymore. This is bullshit." The trial judge then ordered appellant removed from the courtroom. The judge allowed appellant to return to hear the verdict on the condition he remain quiet for the remainder of the proceedings.

#### A. *Appellant's Outbursts Were Not Justified Even If Made in Response to the Prosecutor's Allegedly Improper Closing Argument.*

Appellant argues, as a preliminary matter, his outbursts were somehow justified because they were made in response to the prosecutor's improper argument. We need not decide whether the argument was indeed improper. ■ Where a prosecutor argues improperly, defense *counsel* must object on

the grounds of prosecutorial misconduct and ask the court to admonish the jury to disregard the inappropriate comment in order to preserve the issue for appeal. (See *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468]; See also 7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 207, pp. 209-210.)

Appellant's counsel did not take the appropriate measures in response to the alleged improper comment. Accordingly, there is no claim of prosecutorial error on appeal. ■ Appellant nevertheless seems to argue the prosecutorial comment justified his own disruptive conduct, and that the court below abused its discretion in ejecting him from the courtroom. In response, it is enough to say while an improper argument may understandably inflame a criminal defendant, this does not excuse a defendant's *disruptive* behavior. This is true even if, as appellant contends, the prosecutor's argument was so improper as to constitute misconduct incurable by objection and admonition. While irreparable conduct could in certain circumstances constitute reversible error under a theory of prosecutorial misconduct, (See *Garden Grove School Dist.* v. *Hendler* (1965) 63 Cal.2d 141 [45 Cal.Rptr. 313, 403 P.2d 721]), it cannot serve to justify appellant's behavior, or to characterize his ejection from the courtroom as an abuse of the court's discretion.

B. *The Trial Court Repeatedly Warned Appellant About His Disruptive Conduct and Properly Exercised Its Discretion to Exclude Him From the Courtroom.*

■ In the alternative, appellant contends the trial court abused its discretion by failing to warn him or employ means less drastic before removing him from the courtroom. We disagree with these contentions as well.

A criminal defendant's right to be in the courtroom throughout trial is basic to the guarantees of both the state and federal Constitutions. (See U.S. Const., Amend. VI; Cal. Const., art. I, § 15.) A defendant can lose this right, however, "if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." (*Illinois* v. *Allen* (1970) 397 U.S. 337, 343 [25 L.Ed.2d 353, 359, 90 S.Ct. 1057].)

A trial court is well within its discretion to order a defendant's removal where, as here, the court repeatedly warns the defendant about his disruptive conduct, and specifically warns he may be removed from the court. Appellant began his disruptive behavior at the outset of the trial. He apparently made his first outburst during jury voir dire. The record reflects the trial

judge admonished appellant, outside the presence of the prospective jurors, stating, "Slamming items on the table, blurting out profanities certainly undermines the integrity of this court. . . . We can do things like gag you *or put you in lock up*. I don't want that to happen. But I want you to know *that will happen if you don't continue with respectful conduct in this court* as I expect everyone to behave in this manner."

The trial judge also specifically admonished appellant not to disrupt the closing arguments. "You may not like what the rules of evidence are, but there are rules of evidence that must be abided by. I'm not going to expect any outbursts during argument. Again, I will expect that certain things be abided by in my court. . . . I don't want any further outbursts. If it happens again, Mr. Pena, I will have to have you gagged. Do you understand that?"

We do not agree with appellant's contention a trial judge is required to employ a series of increasingly severe steps to deal with a disruptive defendant before ejecting him or her from the courtroom. Nevertheless, in this case at hand, it is clear the trial judge did employ means less drastic before ejecting appellant from the courtroom. The judge warned appellant twice during the proceedings to maintain courtroom decorum or risk being ejected or gagged. The trial judge also admonished appellant just before ejecting him. Additionally, the court gave appellant the specific option of leaving the courtroom or remaining under "gag." Appellant chose the former, presumably under a belief ejection was less drastic.

Even assuming the court's actions amounted to error, appellant can claim no prejudice from his exclusion. He was outside the courtroom for only the remainder of closing arguments and the reading of the jury instructions. Because appellant was in the courtroom during the presentation of all the evidence, his constitutional right to "confront" witnesses was not impinged upon by his removal. The trial judge also specifically admonished the jurors not to consider appellant's outbursts in making their determination of his guilt or innocence. The trial judge stated: "The court admonishes the jury the defendant's conduct in this courtroom just a few moments ago is not relevant evidence to prove or disprove the charges alleged. His demeanor in this court cannot be considered by you at all in determining his guilt of innocence of the charges alleged."

In sum, we conclude the trial court did not abuse its discretion by excluding appellant from the courtroom.[1]

---

[1]We acknowledge some authority which suggests appellant may have waived his right to appeal on the issue of his ejection from court by failing to object at trial. (*See People* v.

IV. *The Trial Court Erred in Ordering the Burglary Sentence to Run Concurrently to the Rape Sentence.*

The jury ultimately found appellant guilty of all three counts—burglary, forcible rape, and forcible oral copulation. The trial judge imposed the high term of six years for the burglary and ordered it to run *concurrently* to the rape sentence, acknowledging: "Because of the 654 problem in this matter, . . . the court is ordering that count I run concurrent with count II in this case."

Appellant contends the trial judge should have stayed the burglary sentence rather than ordering it to run concurrently with the rape sentence. He contends the sentencing scheme imposed by the court amounts to "double punishment" for multiple acts committed to further one criminal objective which is prohibited by Penal Code section 654.[2] Respondent concedes the sentence should have been stayed, under section 654. We agree with both parties on this score.

■ Section 654 provides: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provision, but in no case can it be punished under more than one . . . ." This section has been interpreted to prohibit double punishment for separate crimes committed with only one criminal objective. (*People* v. *Djekich* (1991) 229 Cal.App.3d 1213 [280 Cal.Rptr. 824]; *People* v. *Booth* (1988) 201 Cal.App.3d 1499 [248 Cal.Rptr. 64].) This section is only aimed against double punishment, however, and does not prevent double convictions. (*People* v. *Greene* (1973) 34 Cal.App.3d 622 [110 Cal.Rptr. 160].)

A. *Appellant Unlawfully Entered the Victim's Home for the Sole Criminal Purpose of Committing Sexual Assault.*

■ Section 654 bars separate punishment for burglary and sexual assault committed with only one criminal objective. Where a defendant unlawfully enters a home for the sole purpose of sexually assaulting the victim within, he or she may not be separately punished both for the burglary and for the sexual crimes. (*In re McGrew* (1967) 66 Cal.2d 685 [58 Cal.Rptr. 561, 427 P.2d 161]; *People* v. *McElrath* (1985) 175 Cal.App.3d 178, 191 [220 Cal.Rptr. 698]; cf. *People* v. *Mixon* (1990) 225 Cal.App.3d 1471 [275

---

*Stankewitz* (1990) 51 Cal.3d 72 [270 Cal.Rptr. 817, 793 P.2d 23]; *People* v. *Duran* (1976) 16 Cal.3d 282, 289 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1] [defendant must object to use of physical restraints or the claim will be deemed waived on appeal]; *People* v. *Taylor, supra,* 31 Cal.3d 488; *People* v. *Chacon* (1968) 69 Cal.2d 765 [73 Cal.Rptr. 10, 447 P.2d 106, 34 A.L.R.3d 454] [defendant must object to prison clothing to raise issue on appeal].)

[2]All further statutory references are to the Penal Code unless otherwise indicated.

Cal.Rptr. 817]; *People* v. *Booth, supra,* 201 Cal.App.3d 1499; *People* v. *Williams* (1984) 157 Cal.App.3d 145 [203 Cal.Rptr. 562]; *People* v. *Murphy* (1980) 111 Cal.App.3d 207 [168 Cal.Rptr. 423] [punishment for burglary arising out of same acts as sexual assaults proper where defendants had multiple objectives to steal from and sexually assault victims when unlawfully entering homes].)

In facts very similar to the case at bar, the California Supreme Court held in *McGrew* a defendant had one criminal objective in the commission of burglary and sexual offenses. The defendant in *McGrew* came to the victim's home and rang her doorbell. When she opened the door, he asked her whether "Janet" lived there. When the victim answered no, the defendant forced his way in, threatened her with a weapon, and forced her to remove her clothing. He then stated he was going to "have her in every possible way," and proceeded to rape and sodomize the victim. The court held, under these facts, "in the absence of any other evidence . . . going to the intent and objective of [defendant] in forcing his way into her home, the only reasonable conclusion is that [he] was motivated by one objective, the commission of the sex offenses he later accomplished." (*McGrew, supra,* 66 Cal.2d at p. 688.)

Here, the victim's own testimony indicates appellant had but one criminal objective when he entered her home on June 27, 1988—sexual assault. Ms. B. testified appellant approached her requesting water. He pushed her into her home and onto a rollaway bed where he immediately raped and orally copulated her. She did not claim appellant attempted to steal anything from her home, or to perpetrate any other crime while he was there. Nor did she testify any items were missing from her home after the incident. Thus, nothing indicates appellant had any objective to commit theft or any other crime other than rape and forcible oral copulation.

## B. *The Court Should Have Stayed the Burglary Sentence.*

When confronted with offenses within the purview of section 654, the proper procedure is to *stay* execution of sentence on all but one of the offenses subject to this section. (*People* v. *Cole* (1985) 165 Cal.App.3d 41 [211 Cal.Rptr. 242].) A concurrent sentence simply does not satisfy the prohibition against double punishment. (*People* v. *Miller* (1977) 18 Cal.3d 873, 886-887 [135 Cal.Rptr. 654, 558 P.2d 552]; *People* v. *Roberson* (1988) 198 Cal.App.3d 860, 872 [244 Cal.Rptr. 51].) ██ Where a trial court erroneously fails to stay terms subject to section 654, the appellate court must stay sentence on the lesser offenses while permitting execution of the greater offense consistent with the intent of the sentencing court. (*People* v. *Thompson* (1989) 209 Cal.App.3d 1075 [257 Cal.Rptr. 658].)

Here, the trial court ordered the six-year sentence for burglary to run concurrently with an eight-year sentence for rape. To satisfy the requirements of section 654, the court should have ordered the burglary sentence stayed.

Accordingly, we conclude the trial court erred in ordering the burglary sentence to run concurrently to the rape sentence. We order modification of the abstract of judgment to stay punishment on the burglary.

V. *The Trial Court Did Not Err in Imposing Full Consecutive Sentences for the Forcible Rape and Forcible Oral Copulation Counts Pursuant to Section 667.6*

At the time of sentencing, the court imposed full term consecutive sentences for the forcible rape and forcible oral copulation, pursuant to California Rules of Court, rule 421 and section 667.6. Pursuant to rule 421, the court imposed the high terms for the two counts, finding a number of factors in aggravation and none in mitigation. The court imposed consecutive terms for the two counts, pursuant to section 667.6, stating:

"The court finds . . . these to be violent sex crimes, within the meaning of Penal Code Section 667.6, and now intends to sentence for those convictions using the provisions set forth in section 667.6 (c) and (d) in lieu of the terms provided in sections 1170.1. . . . The court has considered the criteria [a]ffecting the imposition of concurrent or consecutive sentences and finds per Rule 425 that the crimes involved separate acts of violence."

The trial court went on to find the rape and oral copulation were committed on two separate occasions. The court specifically found, based on evidence elicited during trial, "the defendant had a reasonable opportunity to reflect upon his actions and nevertheless resumed . . . sexually assaultive behavior."

Because the trial court imposed consecutive sentences pursuant to both subdivisions (c) and (d) of section 667.6, we consider the propriety of sentencing under each subdivision.

A. *The Trial Court Erred in Imposing Consecutive Sentences Under Section 667.6, Subdivision (d).*

Appellant contends the trial court erred in imposing consecutive sentences under section 667.6, subdivision (d), because the rape and forcible oral copulation were not committed on two separate occasions but were part

of an uninterrupted sequence of events. He argues they were committed on only one occasion because he did not temporarily lose or abandon the opportunity to continue his attack, nor did he engage in some significant activity unrelated to the sexual assault, between the rape and forcible oral copulation. We agree with appellant's conclusion the acts occurred on only one occasion. We do not, however, adopt his reasoning in reaching that conclusion.

Appellant relies on *People* v. *Craft* (1986) 41 Cal.3d 554 [224 Cal.Rptr. 626, 715 P.2d 585], in support of his contention. In *Craft* the California Supreme Court pronounced "[section 667.6,] subdivision (d) only applies to offenses against the same victim between which the perpetrator temporarily lost or abandoned the opportunity to continue his attack: such opportunity is lost when the victim becomes free of any ongoing criminal activity; it is abandoned when the offender keeps the victim within his control but engages in some significant activities unrelated to continuing his attack." (*Id.* at p. 561.)

However, this interpretation of "separate occasions" was specifically overruled in the 1986 amendment to section 667.6, subdivision (d). In amending this section the Legislature specifically stated: "It is the intent of the Legislature in the enactment [of this amendment] to abrogate the decision in *People* v. *Craft* [citation], and to establish an objective test for determining whether sex crimes against a single victim occurred on separate occasions." (Stats; 1986, ch. 1431, § 2, p. 5129.) Section 667.6, subdivision (d) now provides:

"In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."

Respondent contends the trial court correctly found appellant had a "reasonable opportunity to reflect" between the acts of rape and oral copulation. The People argue appellant had that opportunity when he got off the victim and twisted her body violently before committing the second sexual act.

We must first acknowledge once the trial judge resolves the issue of "separate occasions," an appellate court is "not at liberty to overturn the result unless no reasonable trier of fact could decide that there was a reasonable opportunity for reflection." (*People* v. *Corona* (1988) 206

Cal.App.3d 13, 18, fn. 2 [253 Cal.Rptr. 327].) After analyzing closely those few cases discussing the issue, we conclude no reasonable trier of fact could find a "reasonable opportunity" to reflect between the two crimes under these circumstances.

Little authority exists on the issue of "separate occasions," which applies the *amended* definition of the phrase. It appears only one case, *People* v. *Corona, supra,* 206 Cal.App.3d 13, squarely addressed this issue as it pertains to consecutive sentencing under section 667.6, subdivision (d). The sexual assaults in *Corona* occurred in a car under the defendant's control. Defendant digitally penetrated the victim's vagina and orally copulated her, before finally raping her. He left the car for five minutes, returned, and raped her again.

The court held mandatory consecutive sentences for the two *rapes* which occurred five minutes apart were proper. It held improper consecutive sentences for sexual acts occurring before the first rape. The court found specifically there was no evidence of "any interval 'between' these sex crimes affording a reasonable opportunity for reflection; there was no cessation of sexually assaultive behavior hence defendant did not 'resume sexually assaultive behavior.'" (206 Cal.App.3d at p. 18.)

Another case relevant to the determination of this issue is *People* v. *Hammon* (1987) 191 Cal.App.3d 1084 [236 Cal.Rptr. 822]. The issue in *Hammon* concerned what constitutes separate sexual acts separately punishable under section 654. In *Hammon* the court was faced with sentencing a defendant for identical sexual acts with an infant, the only evidence of which was contained in pornographic photographs. The *Hammon* court announced four methods for determining whether identical sexual acts are distinct crimes.[3] The fourth method adopted the same "reasonable opportunity to reflect" standard used to determine "separate occasions" under section 667.6, subdivision (d).

Applying its own standard to that case, the court first held the defendant could not be separately punished, under section 654, for three counts of lewd touching of the penis, where the photographs depicted "defendant's uninterrupted efforts to obtain sexual gratification by having the infant play with his penis." (*People* v. *Hammon, supra,* 191 Cal.App.3d at p. 1100.) The acts were not divisible on the basis of another offense, time, climax, or opportunity to reflect. Separate punishment was proper, however, for a lewd touch-

---

[3]The court stated: "identical sexual acts constitute separate and discrete crimes when they are separated (1) by the commission of a different sexual offense, (2) by sexual climax, (3) by an appreciable passage of time, or (4) by a reasonable opportunity for reflection." (*Hammon, supra,* 191 Cal.App.3d at p. 1099.)

ing on the bed because defendant had a reasonable opportunity to reflect when he removed himself and the infant from the bathtub to his bed and changed the film in the camera.

Most importantly, however, the court held two separate counts of fellatio could not be upheld where the two relevant photographs depicted the act of fellatio in two separate positions. "The photographs reflect that defendant momentarily disengaged moved slightly and then resumed. Since these counts do not meet the test for separate offenses, defendant could only be convicted of one offense for this conduct." (*People* v. *Hammon, supra,* 191 Cal.App.3d at pp. 1100-1101.) The same was true for two counts of oral copulation, which were distinguishable only by a change in position.

While there is admittedly little authority upon which to decide this issue, the cases discussed above strongly suggest appellant did not have a "reasonable opportunity to reflect" between his acts of rape and forcible oral copulation. As was the case in *People* v. *Corona,* nothing in the record before this court indicates *any* appreciable interval "between" the rape and oral copulation. After the rape, appellant simply flipped the victim over and orally copulated her. The assault here was also continuous. Appellant simply did not cease his sexually assaultive behavior, and, therefore, could not have "resumed" sexually assaultive behavior.

Thus, the case at bar is strongly analogous to *Corona,* in which separate sexual acts occurring one after the other were held to be committed on one "occasion." This conclusion is unaffected by the fact the oral copulation and digital penetration in *Corona* occurred before the rape, and here the oral copulation occurred afterwards.

Neither does our conclusion change when we consider appellant had to change positions in order to orally copulate Ms. B. The holding in *Hammon* strongly suggests a change in positions, alone, is insufficient to provide a perpetrator with a reasonable opportunity to reflect upon his actions, especially where the change is accomplished within a matter of seconds.

We conclude the trial court erred in imposing full term consecutive sentences for forcible rape and forcible oral copulation under the mandatory sentencing scheme of section 667.6, subdivision (d).

 B. *The Consecutive Sentencing Was Proper Under Subdivision (c) of Section 667.6.*

As earlier discussed, the trial court expressed the intent to impose consecutive sentences pursuant to subdivision (c) of section 667.6 as well.

Respondent correctly contends consecutive sentencing is proper under that subdivision.

Section 667.6, subdivision (c) provides for the imposition of consecutive sentences for "violent sex crimes" "whether or not the crimes were committed during a single transaction." Thus, subdivision (c) does not require a finding of "separate occasions." This subdivision also differs from subdivision (d) of section 667.6 insofar as it provides for discretionary, rather than mandatory consecutive sentencing.

What a trial court must do in order to properly impose consecutive sentences pursuant to section 667.6, subdivision (c) is best described by Justice Kaus, writing for a unanimous court, in *People* v. *Belmontes* (1983) 34 Cal.3d 335, 347-348 [193 Cal.Rptr. 882, 667 P.2d 686]:

"A decision to sentence under section 667.6, subdivision (c) is an additional sentence choice which requires a statement of reasons separate from those justifying the decision merely to sentence consecutively. [¶] This does not mean that the reasons justifying full term consecutive sentencing under section 667.6, subdivision (c) must necessarily be different than those used to justify the imposition of consecutive sentences under section 1170.1. The criteria listed in [California Rules of Court,] rule 425—which, as noted, incorporate those of [California Rules of Court,] rules 421 and 423—apply to both decisions and cover all degrees and nuances of depravity. *What is required is an identification of the criteria* which justify use of the drastically harsher provisions of section 667.6, subdivision (c). *The crucial factor, in our view, is that the record reflect recognition on the part of the trial court that it is making a separate and additional choice in sentencing under section 667.6, subdivision (c).*" (Italics added.)

The trial court satisfied all the *Belmontes* requirements. The "crucial factor" of having the record reflect awareness of its separate section 1170.1 and section 667.6 authority was expressly met. The trial court stated: "[The court] now intends to sentence for those convictions [the two subject offenses] using the provisions set forth in section 667.6 (C) and (D) *in lieu of the terms provided in sections 1170.1.*" (Italics added.)

As to identifying the criteria used to justify section 667.6, subdivision (c) sentences, the trial court explicitly named four: (1) "The defendant's prior convictions as an adult are numerous or of increasing seriousness." (Cal. Rules of Court, rule 421(b)(2)); (2) "The defendant was on probation when he committed the crime." (Cal. Rules of Court, rule 421(b)(4)); (3) "The victim was particularly vulnerable . . . in that she is elderly and handicapped." (Cal. Rules of Court, rule 421(a)(3); (4) "The manner in which the crime was carried out indicated premeditation. . . ." (Cal. Rules of Court,

rule 421(a)(8).) That a fifth reason given by the court ("The crimes were committed on separate occasions") was legally improper does not affect the validity of the sentence.

The record justifies section 667.6, subdivision (c) consecutive sentences and supports the trial court's discretion in imposing those sentences. On this record, to remand the matter for resentencing would be worse than an "idle gesture" (*People* v. *Blessing* (1979) 94 Cal.App.3d 835, 839 [155 Cal.Rptr. 780]; *People* v. *Green* (1988) 200 Cal.App.3d 538, 543 [246 Cal.Rptr. 164]; *People* v. *Preyer* (1985) 164 Cal.App.3d 568, 577 [210 Cal.Rptr. 807]; *People* v. *Hartsfield* (1981) 117 Cal.App.3d 504, 509-510 [172 Cal.Rptr. 794]). It would not so subtly convey the message: take the easy section 1170.1 way out and avoid the section 667.6 appellate obstacle course. There is no cause to send such a message and we decline to send it.

## DISPOSITION

The abstract of judgment is ordered modified to stay the burglary sentence. As modified, the judgment is affirmed.

Lillie, P. J., concurred.

**JOHNSON, J.,** Concurring and Dissenting.—I concur with those portions of the majority opinion which affirm the judgment of conviction. I do not agree, however, with the majority's conclusion imposition of full, separate and consecutive sentences under Penal Code section 667.6, subdivision (c) was appropriate on this record.[1]

The statement of reasons given by the trial court, and considered sufficient by the majority, suffers from the same deficiencies identified by our Supreme Court as unacceptable in *People* v. *Belmontes* (1983) 34 Cal.3d 335 [193 Cal.Rptr. 882, 667 P.2d 686]. The majority opinion nevertheless holds it is sufficient if the record demonstrates the trial court was aware it had a sentencing choice between section 1170.1 and section 667.6 even if the reasons supporting the ultimate choice are wholly inadequate. Based on the doctrine of stare decisis, I am compelled to conclude the statement of reasons given by the trial court to justify consecutive sentences under the harsher provisions of section 667.6 is inadequate and the matter should be remanded for resentencing. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937] ["Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function to attempt to overrule decisions of a higher court . . . ."].)

---

[1] All further references are to the Penal Code unless otherwise indicated.

In *Belmontes* the defendant was found guilty of kidnapping, rape, oral copulation, and sodomy. Apparently relying on section 667.6, subdivision (c), the trial court imposed full consecutive sentences for the violent sex crimes. Before imposing sentence, the court recited aggravating and mitigating factors. In aggravation, the court mentioned the violence and cruelty involved in the crimes, the vulnerability and fear of the victim, the threats made against her, the deliberation and premeditation involved in luring her into the car and the defendant's poor performance on parole.[2] In mitigation, the court noted the defendant suffered from a personality defect and had a drinking problem.

The court determined the factors enumerated in California Rules of Court, rule 425 listing criteria affecting the decision to impose consecutive rather than concurrent sentences were equally relevant to a decision to impose consecutive sentences under section 667.6, subdivision (c) (providing for full consecutive terms) in lieu of section 1170.1 (providing for fractional terms to run consecutively to the principal term). The court nevertheless concluded the decision to select the harsher terms of section 667.6, subdivision (c) was a separate sentencing choice for which reasons must be separately stated. "A decision to sentence under section 667.6, subdivision (c) is an additional sentence choice which requires a statement of reasons separate from those justifying the decision merely to sentence consecutively." (*Belmontes, supra,* 34 Cal.3d at p. 347.)

The Supreme Court then explained its holding. "This does not mean that the reasons justifying full term consecutive sentencing under section 667.6, subdivision (c) must necessarily be different than those used to justify the imposition of consecutive sentences under section 1170.1. The criteria listed

---

[2] In identifying the aggravating factors the trial court stated:

" 'The Jury found beyond a reasonable doubt that the Defendant had committed the offenses with which he was charged and the Court, of course, heard the evidence and notes that the crime itself involved violence. It involved cruelty, total lack of consideration by the Defendant for a fellow human being. [¶] The Defendant did have available to him a knife. Threatening remarks were made by the Defendant to the victim. [¶] The victim was a female and was vulnerable to the whims and wishes of the Defendant. [¶] She was reduced to fear. She was not capable of adequately defending herself or protecting herself. [¶] Additionally, such conduct as to conjure up a false story to lure her away from her home and safety, reflects obvious deliberation and premeditation. [¶] Because of the Defendant's acquaintanceship with the victim, and the brother, his brother's acquaintanceship with the victim, it would appear that there was a certain amount of trust and confidence on the part of the victim, which was reposed in the Defendant. [¶] He violated that trust and confidence that was really his. [¶] Now the Defendant himself has demonstrated that he does not perform well on parole or under supervision; that he has been brought back by the Board of Prison Terms, given additional time, additional supervision. I don't really see that his offenses have increased in severity, save and except for the present offense, which is heinous. . . .' " (34 Cal.3d at p. 342, fn. 2.)

in [California Rules of Court,] rule 425—which, as noted, incorporate those of [California Rules of Court,] rules 421 and 423—apply to both decisions and cover all degrees and nuances of depravity. What is required is an identification of the criteria which justify use of the drastically harsher provisions of section 667.6, subdivision (c). The crucial factor, in our view, is that the record reflect recognition on the part of the trial court that it is making a separate and additional choice in sentencing under section 667.6, subdivision (c)." (*Belmontes, supra,* 34 Cal.3d at p. 348.)

The court then outlined the proper procedures for trial courts to follow in sentencing under section 667.6, subdivision (c). "The ideal method of proceeding would be for the trial court first to decide generally between concurrent and consecutive terms, following the criteria listed in [California Rules of Court,] rule 425. Once the court has decided to sentence a defendant to consecutive terms and has stated its reasons therefor, it then must decide whether the consecutive terms should be under the principal/subordinate scheme of section 1170.1 or under the full and separate term scheme of section 667.6, subdivision (c). If the latter is chosen, the reasons therefor should be stated for the record. This decision, of course, should be made very carefully, for the Legislature obviously intended by the alternative language in section 667.6, subdivision (c) that this more punitive provision be reserved for the more serious sex offenders. (See *People* v. *Wilson* [1982] 135 Cal.App.3d 343, 353 [185 Cal.Rptr. 498].)" (*Belmontes, supra,* 34 Cal.3d at pp. 348-349.)

Based on this standard the Supreme Court found the comprehensive statement of reasons given by the trial court (see fn. 2, *ante,* at p. 1319) inadequate to justify imposition of consecutive sentences under the harsher provisions of section 667.6, subdivision (c) and remanded the matter for resentencing. "Although the factors listed are relevant to the choice between concurrent and consecutive sentences under [California Rules of Court,] rule 425, there is no indication why the more punitive provisions of section 667.6, subdivision (c) were chosen over those in section 1170.1." (*Belmontes, supra,* 34 Cal.3d at p. 349.) Similarly in the case at bar, the trial court failed to give a valid statement of reasons for consecutive sentences generally and therefore failed to justify its decision to impose consecutive sentences under the harsher provision of section 667.6, subdivision (c).

In choosing the high base term on the burglary count the court cited the following aggravating factors: the defendant's prior convictions as an adult were numerous or of increasing seriousness and he was on probation when he committed the crime. In sentencing defendant to the high terms for the rape and oral copulation convictions the court identified additional aggravating factors: that the victim was particularly vulnerable, elderly and handicapped and that the manner in which the crime was carried out indicated premeditation.

However, in choosing consecutive sentences over concurrent sentences generally the reason given by the trial court was legally insufficient. The reason the court offered was as follows: "the court has considered the criteria effecting [*sic*] the imposition of concurrent or consecutive sentences and finds per [California Rules of Court,] rule 425 that the crimes involved separate acts of violence. The crimes were committed on separate occasions, in that the defendant had a reasonable opportunity to reflect upon his actions and nevertheless resumed sexual assault—excuse me, sexually assaultive behavior."

As the majority opinion itself explains at section V, A, *ante*, the sexually assaultive acts in this case were not separate acts of violence nor were they committed on separate occasions. Thus, the only reason offered to justify consecutive sentences under either provision was invalid. It consequently appears the court's statement of reasons may have been inadequate to even impose consecutive sentences under section 1170.1. In any event, it was certainly insufficient to impose consecutive sentences under the harsher full term provision which the *Belmontes* court stated requires a *separate and distinct* statement of reasons explaining "why the more punitive provisions of section 667.6, subdivision (c) were chosen over those in section 1170.1." (34 Cal.3d at p. 349.) The trial court identified no reason other than that the crimes were "separate acts of violence" which even the majority finds to be legally erroneous. Because no other reason justifying consecutive terms was offered, there is no valid reason in the record to support consecutive terms in general nor to justify full term consecutive sentences under section 667.6, subdivision (c).

The decision in *People* v. *Wilson* (1983) 135 Cal.App.3d 343 [185 Cal.Rptr. 498], cited with approval in *Belmontes*, bears several similarities to the case at bar. The defendant in *Wilson* was convicted of rape in concert, sodomy in concert and oral copulation. The trial court sentenced him to the high base term on the sodomy conviction and to full, separate and consecutive terms on the rape and oral copulation convictions under section 667.6, subdivision (c).

The Court of Appeal affirmed the judgment but remanded the matter to the trial court for resentencing. The court held the trial court was required to state reasons for imposing consecutive sentences and, furthermore, was required to *separately state* reasons for sentencing the defendant under the harsher provisions of section 667.6, subdivision (c) in lieu of section 1170.1. The court reasoned the "Legislature did not intend the automatic sentencing of multiple violent sex offenders under section 667.6, subdivision (c). . . ." (*Wilson, supra*, 135 Cal.App.3d at p. 352.) The court found the evidence reasonably suggested the defendant's crimes were committed so closely in

time and place as to indicate a single period of aberrant behavior. (*Id.* at p. 353.)

The court contrasted the situation in *Wilson* with the circumstances in *People* v. *Karsai* (1982) 131 Cal.App.3d 224 [182 Cal.Rptr. 406], in which full, separate and consecutive sentences under section 667.6, subdivision (c) were proper for a defendant who was convicted of committing multiple violent sex crimes while on probation for the identical conduct. (*Ibid.*) "Once a trial judge has decided to sentence a multiple sex offender to consecutive terms, the judge must then decide whether the consecutive terms should be subordinate to the principal term under section 1170.1, subdivision (a), or full and separate terms under section 667.6, subdivision (c). This decision must be made thoughtfully because the Legislature obviously intended by the alternative language in section 667.6, subdivision (c), that the more punitive statute be utilized for the more serious sex offenders such as Karsai with his prior sex offense record." (135 Cal.App.3d at p. 353; see also *People* v. *McElrath* (1985) 175 Cal.App.3d 178 [220 Cal.Rptr. 698] [consecutive terms under section 667.7, subdivision (c) proper because the trial court found "the defendant to be a more serious sex offender. . . ."]; compare *People* v. *Jones* (1988) 46 Cal.3d 585 [250 Cal.Rptr. 635, 758 P.2d 1165] [full consecutive sentences proper under section 667.7, subdivision (c) where defendant convicted of single heinous sex crime as well as other felonies].)

As many courts have recognized, the Legislature intended full, separate and consecutive terms under section 667.6, subdivision (c) be reserved for the truly serious sex offender. In interpreting that section the *Belmontes* court directed trial courts to identify the factual circumstances which would justify full term consecutive sentences under section 667.6, subdivision (c) as distinct from, or in addition to, those circumstances which would justify consecutive sentences generally. Because the trial court in the present case only gave the single invalid reason for consecutive sentences generally as well as for sentencing to full consecutive terms under section 667.6, subdivision (c), the statement of reasons was inadequate and the matter should be remanded for resentencing.

Consequently, there are several reasons why I cannot join my colleagues in overlooking the deficient justification for consecutive sentences in this case. First, as previously stated, the high court's decision in *Belmontes* precludes such a course as a matter of stare decisis. Second, condoning, overlooking or excusing a deficient statement of reasons for a sentencing choice would encourage lax or sloppy treatment of significant sentencing issues affecting a person's liberty interests. Third, requiring a trial court to state its reasons for exercising sentencing discretion promotes uniformity

and proportionality in sentencing. Fourth, an adequate statement of reasons on the record provides meaningful appellate review to determine whether in a given instance a trial court has abused its discretion. Finally, while I acknowledge complying with the *Belmontes* decision requires an additional step in the sentencing procedure, the extra work for the trial judge is not nearly as onerous a burden as the extra years a defendant may have to serve unjustifiably if a trial court is not required to carefully and thoughtfully exercise its discretion.

For these reasons I would find the trial court's statement of reasons inadequate to impose full term consecutive sentences under section 667.6, subdivision (c) and would remand the matter for resentencing.

Appellant's petition for review by the Supreme Court was denied September 24, 1992. Mosk, J., was of the opinion that the petition should be granted.