Filed 11/14/13  P. v. Simpson CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TIMOTHY TYRONE SIMPSON,<br><br>    Defendant and Appellant. | H038847<br>(Santa Clara County<br>Super. Ct. No. C1065365) |

This is the second appeal for defendant Timothy Tyrone Simpson who was initially convicted by a jury of sexual offenses against three minor victims and sentenced to 90 years to life, consecutive to 15 years, in prison.  In the first appeal we concluded the evidence was insufficient to support the convictions for forcible sexual penetration and forcible rape as to one of the victims (victim 1) and reduced those convictions to the lesser included offenses of assault with intent to commit sexual penetration and assault with intent to commit rape (former Pen. Code,[1] § 220, subd. (a)).[2]  We remanded for resentencing.  (*People v. Simpson* (Sept. 26, 2011) H036255 [nonpub. opn.].)

_____

[1] Further unspecified statutory references are to the Penal Code.

[2] Former section 220, subdivision (a) (now subdivision (a)(1)) provided as follows:  "[A]ny person who assaults another with intent to commit mayhem, rape, sodomy, oral copulation, or any violation of Section 264.1, 288, or 289 shall be punished by imprisonment in the state prison for two, four, or six years."  Section 220 was amended effective September 9, 2010, redesignating subdivision (a) as (a)(1) without change and adding subdivision (a)(2), which provides longer prison terms for qualifying assaults against a victim who is under age 18.  Since the relevant offenses took place in (continued)

On remand, the trial court imposed a total term of 33 years, which included consecutive eight year terms (twice the middle term of four years) on the two assault charges. Simpson appeals from this new sentence.

Simpson argues that the trial court erred in imposing consecutive sentences on the two assault convictions because: (1) it failed to state sufficient reasons to impose consecutive sentences as required by section 667.6, subdivision (c);[3] (2) the offenses were not separate acts supported by separate intents; and (3) trial court improperly concluded the two offenses were violent even though this court had found, in Simpson's first appeal, there was insufficient evidence to establish that they involved force, fear or duress. Simpson further argues, to the extent his claims are deemed forfeited due to defense counsel's failure to object below, his counsel provided constitutionally ineffective assistance.

We reject his arguments in their entirety and shall affirm the judgment.

I. FACTUAL AND PROCEDURAL BACKGROUND

This appeal concerns only the two counts (counts 2 & 3) which involved Simpson's assaults on victim 1. We therefore recount, from our September 26, 2011 nonpublished opinion on Simpson's initial appeal, the facts relating to those offenses.

"1. *Victim 1's testimony*

"Victim 1, who was 19 at the time of trial, began living in San Jose with her aunt, [A.], at the age of 14. [A.]'s daughter, victim 2, also lived with them and was six years younger than victim 1. Victim 1 was born with a partial hearing impairment; she could hear music and people talking on the phone without an aid, but was otherwise deaf

---

May of 2008, Simpson was not subject to the increased penalties provided under subdivision (a)(2).

[3] Hereafter "section 667.6(c)."

without her hearing aids.[4]  She began using sign language first, but began to learn to speak at the age of four or five and can read lips 'about . . . 50 percent.'

"Victim 1 considered [A.] to be a 'second mom,' and [A.] was her legal guardian while victim 1 lived with her.  Simpson, who is victim 2's father, was not living at the house when victim 1 moved in, but did live there at times.  Victim 1 referred to Simpson as 'Uncle Tim.'

"[In May 2008], [A.] gave birth to another daughter, fathered by Simpson.  Victim 1 was 16 years old at the time.  Between 1:30 a.m. and 1:40 a.m. on May 11, 2008, victim 1 was sleeping on the sofa in the living room, when she awoke to find Simpson on top of her.  She could feel one or two of his fingers inside her vagina, and she noticed her pants and underwear had been removed at some point while she slept.  Simpson was naked and victim 1's legs had been spread apart.  He did not say anything to her, but his arm was moving back and forth.  She then felt him insert his penis about a quarter of the way into her vagina.  Victim 1 told Simpson to get off, and she pushed him away.[5]

"She did not experience any pain or physical discomfort, but was shocked, confused and disgusted.  In all, she estimated his finger(s) were inside her for five seconds or less and his penis was inside her for 25 seconds or less.  Victim 1 was afraid Simpson would verbally abuse her, but he did not threaten her, hold her down or hit her at any time.

"Victim 1 grabbed her pants and underwear off the floor, ran to her bedroom and locked the door behind her.  She got dressed, and was lying on the bed, crying, when Simpson somehow got into the room.  He went over to the bed and told victim 1 that no one would believe her if she said anything and she should not tell anyone what happened.

---

[4] "Though assisted by an American Sign Language interpreter at trial, victim 1 answered the questions put to her orally in order to demonstrate her self-confidence."

[5] "Victim 1 was 16 at the time of this incident, and was 5 feet, 7 inches tall, weighing 135 pounds.  Simpson was 6 feet, 2 inches tall and weighed over 250 pounds."

3

He grabbed her arms and shoulders, and when he kissed her on the cheek,[6] she could smell alcohol on his breath. Simpson left the room, but came back and again told her not to tell anyone.

"Later that morning, victim 1 went to the hospital to visit [A.] and told her what had happened. [A.] started crying and asked victim 1 if she was going to report it to the police. Victim 1 did not want to call the police because she was embarrassed and was concerned about splitting up the family. Her aunt went along with her wishes.

"Over the next year, victim 1 felt uncomfortable around Simpson and avoided being alone with him, although she did have him perm her hair at one time. At another point during this year, while they were both in the kitchen, Simpson smacked victim 1 on the rear, which made her feel more uncomfortable. She also stopped inviting her girlfriends over to visit, because Simpson would act friendly toward them and victim 1 did not want him getting 'close' to them.

"At some point after [A.] and Simpson had their second daughter, they all moved to a new residence and Simpson began living with the family.

"In June 2009, victim 1 graduated from high school. She invited a friend from Sacramento, victim 3, to visit and attend her graduation. On the evening of June 13, victim 1, victim 3 and [A.] watched television in the living room. Victim 1 fell asleep on the floor between 11:00 p.m. and 12:30 a.m. At about 7:00 a.m., victim 3 woke her up, looking uncomfortable and nervous. Even though victim 3 was supposed to stay with victim 1 for four weeks, her bag was packed and she had placed it near the front door. Using sign language, victim 3 told victim 1 that Simpson had come into the bedroom where she was sleeping and tried to talk to her, but she could not understand him. He

---

[6] "On cross-examination, victim 1 admitted she never told the police about Simpson kissing her on the cheek after he assaulted her, and she did not mention this in her testimony at the preliminary hearing."

4

left, but then returned, lay down on the bed with her and began rubbing her rear end.  She began to get up and he walked out of the room.

"Victim 1 broke down after hearing this, and told victim 3, without going into detail, that Simpson had touched her the year before.  Victim 1 went into [A.]'s room, woke her, and asked her to come outside so she could talk to her without waking Simpson who was asleep next to [A.].  Victim 1, victim 3 and [A.] went outside where victim 1 relayed what victim 3 had told her.  [A.] began crying, and walked into the family room, where victim 2 was sleeping and asked if something had happened to her.  Victim 1 did not hear victim 2's response, because she accompanied victim 3 to the train station so victim 3 could go home.

"At the train station, victim 1 was picked up by Simpson's brother, [A.], victim 2 and the baby.  Simpson's brother drove to the hospital, where victim 1 talked to a police officer about what had happened to her the year before. [¶] . . . [¶]

"*4. Hospital examinations and police investigation* [¶] . . . [¶]

"Anthony Serrano, an investigator in the San Jose Police Department's Sexual Assault Unit, interviewed victim 1 and victim 2 on July 21, 2009, at the children's interview center.  He interviewed each victim separately and the interviews were video recorded. [¶] . . . [¶]

"Serrano interviewed victim 1 for approximately one hour.  He says she was cooperative, but needed to compose herself three or four times during the interview at points when the questions became more detailed about the assault.  There was no sign language interpreter present during the interview and victim 1 spoke her responses to Serrano's questions.  Victim 1 told Serrano she awoke about 1:15 a.m. to find Simpson putting his finger inside of her vagina.  Her pants and underwear had been taken off as she slept.  She also said she did not know what was going on and 'when I turned, he put his finger in me.'  As she became more awake and could see more clearly, he moved on

5

top of her, separated her legs and tried to put his penis in her vagina.  She then pushed Simpson off, grabbed her clothes and left the room.

"*5.    Prior acts evidence*

"A prior victim, who was 28 at the time of trial, testified she met Simpson at an apartment complex one evening while she was hanging around with some of her friends. She was then 15 years old.

"Someone mentioned they wanted to go to a fast-food restaurant, and the victim and several others got into a van driven by Simpson.  They ordered from the 'drive-thru' window and came right back to the apartment complex.  As everyone was climbing out, Simpson said he wanted to talk to the victim.  Though she thought this was strange, she agreed since he said they would only go to the end of the building and it would be 'real quick.'  Simpson told her to get in the front seat and she complied.

"Simpson drove to the end of the structure, but exited the complex and drove down a few streets before parking.  He asked her if she wanted to make some money, and she said, 'As long as it's legal.'  Simpson started the car and drove onto the freeway.  The victim asked him where he was going, and he said he was just going to the store.  The victim started to get worried, and after what felt like an hour to her, Simpson pulled over in a sparsely-populated neighborhood.

"Simpson started touching her leg, telling her she had to prove she was not a police officer and had to show her 'loyalty.'  As he continued to rub her leg, the victim realized that something bad was going to happen and began to scream and cry, telling him to leave her alone.  He remained calm and said she needed to prove her loyalty.  He also said that someone had sent him to kill her.  The victim finally said she was having her period, but Simpson leaned over her and took her pants off.  He pulled out her tampon, rolled down the window and threw it out of the van.  Simpson then raped the victim.

"Afterwards, Simpson told the victim he would take her home, but warned her not to say anything to anyone. On the way to her house, Simpson played music on the radio and was 'being extra nice' to her. The victim feared for her life, and did not want Simpson to know where she lived, so she directed him just to the front of the condo complex. As she got out, Simpson said, 'Make sure you don't tell anyone what happened.' He also wrote his telephone number on a piece of paper and told her to call him.

"The victim did not immediately report the incident to the police. Because of her cultural background,[7] she was afraid her family would disown her if they learned she was raped. The next day, the victim did tell her best friend what had happened and her best friend's parents convinced her to call the police a few days afterward. [¶] . . . [¶]

"7.     *Stipulations* [¶] . . . [¶]

"It was further stipulated that, on December 21, 1999, Simpson was convicted of a felony violation of section 261.5, subdivision (d). In that case, Simpson was found to have had unlawful sexual intercourse with a minor, i.e., the prior victim, when he was over 21 years old and the minor was under 16 years of age."

The jury convicted Simpson of committing a lewd or lascivious act on a child under 14 (§ 288, subd. (a), count 1), sexual penetration by force, violence, duress, menace or fear (§ 289, subd. (a)(1), count 2), rape by force, violence, duress, menace or fear (§ 261, subd. (a)(2), count 3) and misdemeanor sexual battery (§§ 242, 243.4, subd. (e)(1), count 4).[8] The jury also found true the allegations in counts 1, 2 and 3 that Simpson committed those offenses against more than one victim within the meaning of

_____

[7] "The victim is Persian and was born in Iran."

[8] Simpson's convictions on counts 1 and 4, which arose out of his offenses against victims 2 and 3, respectively, are not at issue in this appeal.

7

section 667.61, subdivision (b) and (e). Simpson admitted having a prior felony strike conviction. (§§ 667, subds. (a), (b)-(i), 1170.12.)

In his initial appeal, we found there was insufficient evidence to support Simpson's convictions for forcible sexual penetration or forcible rape (counts 2 & 3), but the evidence was sufficient to convict him of the lesser included offenses of assault with intent to commit sexual penetration and assault with intent to commit rape. Accordingly, we reversed and remanded the matter to the trial court with instructions to modify the judgment to reflect convictions on those lesser included offenses and resentence Simpson accordingly.

At his resentencing hearing, Simpson argued the trial court had discretion to impose concurrent, rather than consecutive, sentences under section 667.6(c)[9] on counts 2 and 3 because the digital penetration and rape did not constitute separate acts.

After first denying Simpson's renewed *Romero*[10] motion, the trial court pronounced sentence, stating it had "read and reviewed this matter very care[ful]ly." As sentencing had been "on calendar several times[,] . . . [the court had] the opportunity to reflect on what [it] think[s] is appropriate in this particular case." The court agreed that section 667.6(c) applied,[11] and found that consecutive sentences were appropriate, "based on the fact while this was a situation that, again, spa[t]ially and otherwise was very close in time, . . . there [were] separate acts, separate manifestation[s] of an intent to sexually

---

[9] Section 667.6(c) provides in pertinent part: "In lieu of the term provided in Section 1170.1, a full, separate, and consecutive term may be imposed for each violation of an offense specified in subdivision (e) if the crimes involved the same victim on the same occasion." Assault with intent to commit sexual penetration and assault with intent to commit rape are specified offenses pursuant to section 667.6, subdivision (e)(9).

[10] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

[11] The People argued consecutive sentences were mandatory under section 667.6, subdivision (d) (hereafter "section 667.6(d)"), but in the alternative, argued the court should impose discretionary consecutive sentences under section 667.6(c).

assault in this case.  These were reduced to [section] 220s.  And the court finds based on the fact that they were separately manifested intents to do separate acts of violence against a single victim that they weren't to increase punishment provided under [section] 667.6(c) in each case.  [*Sic*.]"

## II.  DISCUSSION

### A.  *Standard of review*

Sentencing decisions are reviewed for abuse of discretion.  (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)  Under this standard, a trial court's exercise of discretion will not be disturbed, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.  (*People v. Jordan* (1986) 42 Cal.3d 308, 316.)  " 'In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' " (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977-978.)

### B.  *Statement of reasons for sentencing under section 667.6(c)*

#### 1.  *Failure to object below*

The People note that Simpson's counsel did not object at the sentencing hearing to the trial court's statement of reasons for imposing consecutive sentences under section 667.6(c) and thus the objection has been forfeited.  We agree.

"A party in a criminal case may not, on appeal, raise 'claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices' if the party did not object to the sentence at trial." (*People v. Gonzalez* (2003) 31 Cal.4th 745, 751, citing *People v. Scott* (1994) 9 Cal.4th 331, 353 (*Scott*).)  The rationale for this rule is elementary:  "[C]ounsel is charged with understanding, advocating, and clarifying permissible sentencing choices at the sentencing hearing[,] [and] [r]outine defects in the court's statement of reasons are easily prevented and corrected if called to the court's attention." (*Scott*, *supra*, at p. 353.)  So long as there is a meaningful opportunity for

9

counsel to object to purported deficiencies in the trial court's statement of reasons for its sentence choices during the sentencing hearing, counsel's failure to do so forfeits any appellate claim of error. (*Id.* at p. 356.)

This is just the sort of case *Scott* envisioned. If counsel had raised the issue at the sentencing hearing, the trial court could have restated its reasons on the record.[12] Although Simpson's counsel did argue for concurrent sentencing and urged the court to exercise its discretion under section 667.6(c), his argument does not suffice to preserve his claim that the trial court's statement of reasons for imposing consecutive sentences was insufficient. It is true the court ultimately rejected his argument that concurrent sentences were appropriate, but it would not have been futile for counsel to object that the trial court had failed to make an adequate statement of the reasons underlying its decision to impose consecutive sentences instead. Accordingly, Simpson has forfeited the objection.

In spite of this finding, we elect to reach the merits of this claim as Simpson has also argued that his counsel was ineffective for failing to timely object.

*2.      The trial court's statement of reasons was sufficient*

"In deciding whether to sentence consecutively or concurrently, and if consecutively, whether to do so under section 1170.1 or under the harsher full term provisions of subdivision (c) of section 667.6, the court is obviously making separate and distinct decisions. A decision to sentence under section 667.6, subdivision (c) is an additional sentence choice which requires a statement of reasons separate from those justifying the decision merely to sentence consecutively." (*People v. Belmontes* (1983) 34 Cal.3d 335, 347, fn. omitted (*Belmontes*).) However, "[t]his does not mean that the reasons justifying full term consecutive sentencing under section 667.6, subdivision (c)

---

[12] This is not to say we think the trial court's statement of reasons was insufficient, as discussed in more detail below.

10

must necessarily be different than those used to justify the imposition of consecutive sentences under section 1170.1. . . . The crucial factor . . . is that the record reflect recognition on the part of the trial court that it is making a separate and additional choice in sentencing under section 667.6, subdivision (c)." (*Id.* at p. 348.)

*Belmontes* explained that the "ideal method" the trial court should follow would be to decide generally between concurrent and consecutive terms, employing the criteria in California Rules of Court, rule 4.425.[13] (*Belmontes*, *supra*, 34 Cal.3d at p. 348.) Once the court has selected consecutive terms and stated reasons for that selection, it must decide whether to sentence under section 1170.1 or section 667.6(c). (*Belmontes*, *supra*, at p. 348.) If the court opts to sentence the defendant under the latter statute, it must state its reasons for the record. (*Ibid.*)

In determining whether a sentence should be concurrent or consecutive, rule 4.425 of the California Rules of Court sets forth some of the criteria[14] the court may consider. Any circumstance in aggravation or mitigation may be considered in determining whether to impose consecutive sentences, with the exceptions of a fact used to impose the upper term, a fact used to otherwise enhance the defendant's prison sentence, and a fact that is an element of the crime. (Cal. Rules of Court, rule 4.425.)

A consecutive sentence can be supported by just one factor or criterion in aggravation. (*People v. Bravot* (1986) 183 Cal.App.3d 93, 98.) The circumstances in aggravation listed in rule 4.421 of the California Rules of Court include factors relating to the crime and factors relating to the defendant. Several of those factors, specifically whether "[t]he victim was particularly vulnerable," (Cal. Rules of Court, rule 4.421(a)(3))

---

[13] The *Belmontes* court cited to California Rules of Court, rule 425, which was renumbered effective January 1, 2001. (See Historical Notes to Cal. Rules of Court, rule 4.425.)

[14] Rule 4.408 of the California Rules of Court authorizes the court to consider any other criteria reasonably related to its discretionary sentencing decision.

"[t]he defendant took advantage of a position of trust or confidence to commit the offense," (*id*. rule 4.421(a)(11)) and "[t]he defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness" (*id*. rule 4.421(b)(2)) are applicable here.

After first recounting the reasons for denying Simpson's renewed *Romero* motion, the court indicated it believed it had discretion to impose consecutive full-term sentences on counts 2 and 3 pursuant to section 667.6(c), rejecting the prosecutor's argument that the mandatory sentences prescribed by section 667.6(d) applied. The basis for the court's decision to impose consecutive full-term sentences was that "there [were] separate acts, separate manifestation of an intent to sexually assault in this case."

This is sufficient. The court indicated it was aware it was "making a separate and additional choice in sentencing under section 667.6, subdivision (c)." (*Belmontes*, *supra*, 34 Cal.3d at p. 348.) It then noted the reason it was imposing consecutive full-term sentences under that statute was "based on the fact that [the offenses] were separately manifested intents to do separate acts of violence against a single victim."

It is true, as Simpson points out, the trial court's statement of reasons could also justify consecutive sentences under section 1170.1. *Belmontes*, however, makes clear that a sentencing court may properly rely on the same reasons in exercising its discretion under section 667.6(c). (*Belmontes*, *supra*, 34 Cal.3d at p. 348.) "The crucial factor . . . is that the record reflect recognition on the part of the trial court that it is making a separate and additional choice in sentencing under section 667.6, subdivision (c)." (*Ibid.*) The trial court expressly noted it was doing so here.

However, even if we were to find the trial court's statement of reasons insufficient, there is no reasonable probability it would make a different sentencing choice on remand. In discussing Simpson's *Romero* motion, the trial court identified numerous aggravating factors relating to his crimes and the victims as well as factors relating to Simpson himself. Simpson's crimes "involved separate acts against younger

women," which involved "a position of trust, family trust." Simpson's various prior offenses "that the court is not particularly impressed with," included forcible sodomy, various battery offenses, a section 273.5 violation (willful infliction of corporal injury), multiple violations of a protective order, two violations of section 243, subdivision (e) (domestic violence), and a criminal threat misdemeanor. Any of these reasons would be sufficient to impose consecutive sentences pursuant to section 667.6(c).

Furthermore, because the trial court's statement of reasons for imposing consecutive sentences under section 667.6(c) was sufficient, Simpson's counsel was not ineffective for failing to object. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 463 ["Representation does not become deficient for failing to make meritless objections."].)

3.       *The trial court did not err in imposing consecutive sentences*

Simpson contends the trial court's analysis of whether he "manifested separate intents such that consecutive sentences were warranted" under section 667.6(c) should have been guided by cases such as *People v. Corona* (1988) 206 Cal.App.3d 13, *People v. Magana* (1991) 230 Cal.App.3d 1117, *People v. Pena* (1992) 7 Cal.App.4th 1294 and *People v. Plaza* (1995) 41 Cal.App.4th 377. He acknowledges these cases involve the question whether crimes against a single victim were committed on "separate occasions" under section 667.6(d), but suggests they are nonetheless "instructive" for purposes of analyzing consecutive sentences under section 667.6(c). We disagree.

The analysis of whether offenses were committed on "separate occasions" under section 667.6(d) turn on whether the evidence shows an interval affording "the defendant . . . a reasonable opportunity to reflect upon his or her actions" between those offenses. (§ 667.6(d); see *People v. Corona*, *supra*, 206 Cal.App.3d at p. 18 [no evidence of interval between sex crimes affording reasonable opportunity for reflection]; *People v. Pena*, *supra*, 7 Cal.App.4th at p. 1299 [no appreciable interval between rape and oral copulation]; *People v. Plaza*, *supra*, 41 Cal.App.4th at p. 385 [evidence showed defendant had reasonable opportunity to reflect between sex crimes but resumed

13

assaultive behavior].) In this case, the trial court found section 667.6(d) did not apply, thus impliedly ruling counts 2 and 3 were not committed on "separate occasions." Instead, the trial court found it had discretion to impose consecutive full term sentences under section 667.6(c) for offenses committed against the same victim on the "same occasion." "Separate occasions" are not equivalent to the "same occasion" and cases discussing what "separate occasions" means are inapposite to the discretionary sentencing provisions of section 667.6(c).

If, as Simpson appears to argue, the justification for imposing discretionary consecutive full term sentences under section 667.6(c) for offenses committed on the "same occasion" can *only* exist if the evidence supports a showing that the offenses were committed on "separate occasions," the sentencing court would never reach the discretionary sentencing provided in section 667.6(c). The sentencing court would always be in the position of either imposing mandatory consecutive full-term sentences under section 667.6(d) or sentencing under section 1170.1. Adopting Simpson's analytical framework would render section 667.6(c) surplusage, an outcome we actively seek to avoid when construing statutes. (*People v. Arias* (2008) 45 Cal.4th 169, 180.)

### 4. The characterization of the offenses as "*acts of violence*"

Finally, Simpson takes issue with the trial court's finding that counts 2 and 3 involved "separate manifested intents to do separate acts of violence." Simpson argues that our prior opinion in this case foreclosed any characterization of those counts as violent crimes, because we found insufficient evidence that Simpson's offenses were committed by means of force, fear or duress. (*People v. Simpson* (Sept. 26, 2011) H036255 [nonpub. opn.].) This is an overly broad reading of our decision in that case.

In our prior opinion, we directed the trial court to reduce Simpson's convictions on counts 2 and 3 to the lesser included offenses of assault with intent to commit sexual penetration and assault with intent to commit rape (§ 220, subd. (a)(1)). We did so because the evidence presented at trial was that victim 1 was asleep when Simpson

14

removed his own clothing along with her pajama bottoms and panties and inserted his finger into her vagina. At some point she awoke, though she was confused and groggy and Simpson removed his finger and inserted his penis in her vagina for up to 25 seconds. She was not afraid, and Simpson never threatened her or held her down. Simpson did not resist when she threw him off and he did not grab her or otherwise touch her when she gathered her clothes and retreated to her bedroom. While his actions did not meet the qualifications for forcible sexual penetration (§ 289, subd. (a)(1)) and forcible rape (§ 261, subd. (a)(2)), that does not mean his actions were per se nonviolent. Section 240 defines "assault" as "an unlawful attempt, coupled with a present ability, to commit a *violent injury* on the person of another." (Italics added.) A violation of section 220 also qualifies as a "violent felony" pursuant to section 667.5, subdivision (c)(15).

Accordingly, the trial court did not err in describing Simpson's offenses as "acts of violence."

**III.    DISPOSITION**

The judgment is affirmed.

_____
Premo, J.

WE CONCUR:

_____
Rushing, P.J.

_____
Elia, J.