Filed 5/12/16  P. v. Amaya CA2/3

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH LEO AMAYA,<br><br>      Defendant and Appellant. | B259144<br><br>(Los Angeles County<br>Super. Ct. No. KA103513) |


APPEAL from a judgment of the Superior Court of Los Angeles County, George Genesta, Judge.  Affirmed as modified.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Timothy M. Weiner, Deputy Attorney General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant Joseph Leo Amaya was convicted of forcible rape, sexual penetration by object, assault with intent to commit sexual penetration, and related kidnapping allegations. On appeal, he contends that there is insufficient evidence he penetrated the victim's anal opening with the handle of a toilet plunger, that the jury instructions misstated the intent required for penetration by object, and that his consecutive one-strike sentences are unauthorized because no reasonable trier of fact could have concluded he had a sufficient opportunity to reflect during the attack. We modify the judgment to correct the fines and fees and affirm as modified.

## PROCEDURAL BACKGROUND

By first amended information filed August 15, 2014, defendant was charged with two counts of forcible rape (Pen. Code,[1] § 261, subd. (a)(2); counts 1, 5), two counts of sexual penetration by foreign object (§ 289, subd. (a)(1)(A); counts 2, 3), and one count of assault with intent to commit rape, sodomy, or oral copulation (§ 220, subd. (a)(1); count 6).[2] For each count, the information also alleged defendant kidnapped the victim within the meaning of the One Strike Law (§ 667.61, subds. (a), (d)(2)).

Defendant pled not guilty and denied the allegations. After a jury trial at which he did not testify, the jury convicted defendant of all counts and found each allegation true.

The court sentenced defendant to 100 years to life. For counts 1 and 5 (§ 261, subd. (a)(2); rape) and counts 2 and 3 (§ 289, subd. (a)(1)(A); sexual penetration by object), the court sentenced defendant to consecutive one-strike terms of 25 years to life (§ 667.61, subds. (a), (d)(2), (i); § 667.6, subd. (d)). For count 6 (§ 220, subd. (a)(1);

---

[1] All undesignated statutory references are to the Penal Code.

[2] The original information, filed December 27, 2013, alleged counts 1 through 5. On August 15, 2014, the People amended the information by interlineation to add count 6 and to dismiss count 4 (§ 664/289, subd. (a)(1)(A); attempted sexual penetration by object) and the related kidnapping allegation.

assault with intent to commit sexual penetration by object), the court struck the allegation because count 6 was not a one-strike offense, and imposed the middle term of four years, to run concurrent.

Defendant filed a timely notice of appeal.

## FACTUAL BACKGROUND

On October 19, 2013, B. Doe (B.) was working as a cashier during the night shift at the Peck Minimart in El Monte. A friend had dropped her off, and her father would pick her up at the end of the night. She was working alone.

A few hours into B.'s shift, defendant entered the store and began asking her increasingly personal questions—where she lived, who was going to pick her up from work, her phone number, and which door she used to leave. He also asked B. about condoms that were for sale in the market and showed her a tattoo on the back of his neck. After about 20 minutes, defendant left.

About an hour later, towards the end of her shift, B. was working in the back storage room when defendant returned. Defendant entered the storage room and approached B. He was holding a wire or cord, and held it up to her neck as if he were going to choke her. B. screamed and ran to the front of the store. Defendant followed her; he said he was just playing around. B. told him to leave, and he did, walking out the side door. B. locked that door behind him, and ran to lock the other entrance. Defendant got there first.

As B. tried to lock the front door, defendant forced his way inside the store. He pushed an arcade game across the entrance and turned off the lights.[3] Then he grabbed B. by the hair, causing her to fall. She dropped her keys and phone; defendant put them in his pocket.

---

[3]     On our own motion, we take judicial notice of the trial exhibits in superior court case no. KA103513. (Evid. Code, § 452, subd. (d)(1).) Based on our review of exhibits 3 and 4, it appears the arcade game used to blockade the door was *Cruis'n USA*, a coin-operated, standing game with an attached steering wheel, housed in a classic arcade cabinet. The game is about the same size as a vending machine.

3

Defendant dragged B. into the restroom at the back of the minimart, closed the door, and ordered her to pull down her pants. When she refused, he pulled them down himself. Holding B. from behind, defendant pushed his fingers into her vagina with enough force to lift her off the ground. She screamed and tried to push him away. In response, defendant punched her in the face. Defendant removed his penis from his pants and forced it into B.'s vagina.

Next, defendant grabbed a nearby toilet plunger. He "trie[d] to insert" the plunger handle "near [B.'s] anal area." B. testified that the handle touched her "anal area" but did not penetrate the actual anus. After trying and failing to insert the handle into B.'s vagina, defendant dropped the plunger and reinserted his penis into her vagina.

While raping her vaginally, defendant removed his shirt, rolled it up, and stuffed it into B.'s mouth. He then slid the shirt down her neck and choked her with it. Throughout the ordeal, defendant punched B. in the head and slammed her head into the paper towel dispenser on the adjacent wall. Defendant told her to "shut up or he'll hurt [her] or kill [her]." Eventually, defendant removed his penis from B.'s vagina, masturbated, and ejaculated into the toilet.

At that point, B.'s phone started to ring; defendant took the phone out of his pocket and asked her who kept calling. She replied, "My dad is outside. Just leave, please." Defendant pulled up his pants, told B. to stay in the restroom, and left. As she waited, B. heard defendant move the arcade game away from the front door. She ran outside, where her father and sister were waiting for her in a car.[4]

When police responded to the Peck Minimart, they found B. sitting on the curb in front of the store with her father and sister. She was bleeding from the vagina, and had head pain and bruises on her legs. B. was taken to the hospital, where Toyetta Beukes, a nurse from the Sexual Assault Response Team, performed an exam. The exam revealed

_____

[4] A surveillance system captured both audio and video footage of the attack. After B. testified, the jury watched the surveillance video, which documented the events outside the restroom, and listened to four five-minute portions of the audio recording. B. is heard crying, screaming, and pleading with defendant to stop.

4

multiple abrasions, tenderness to B.'s forehead, an abrasion inside her mouth, genital tears and abrasions, perianal tears and tenderness, and lacerations and tenderness to the perineum. The next day, B. identified defendant from a six-pack photo array.

A Sheriff's Department criminologist testified that samples taken from the minimart toilet were consistent with defendant's DNA. B.'s DNA was consistent with samples taken from the plunger handle. Swabs of B.'s genitals and leg indicated the presence of semen. However, those samples did not contain enough male DNA to complete a profile. An independent DNA analyst conducted a different, more amplified test and concluded defendant was a major contributor to the sample taken from the vulva swab, a contributor to the sample taken from the anal swab, and a possible contributor to the sample taken from the vaginal swab.

Defendant was arrested on October 26, 2013, one week after the attack.

## CONTENTIONS

Defendant contends that there is insufficient evidence of penetration to support his conviction for count 3, that the jury instructions for counts 2 and 3 misstated the required intent, and that his consecutive one-strike sentences are unauthorized because no reasonable trier of fact could have concluded defendant had a reasonable opportunity to reflect during the attack.

## DISCUSSION

### 1.     Sufficiency of the Evidence to Support the Conviction for Count 3

Defendant was charged in counts 2 and 3 with sexual penetration by foreign object (§ 289, subd. (a)(1)(A)). Count 3 alleged sexual penetration of the anus with a toilet plunger; count 2 alleged sexual penetration of the vagina with fingers. Defendant contends there is insufficient evidence of penetration to support count 3. He argues B.'s own testimony reflected her uncertainty as to penetration, and though there was evidence of trauma to B.'s perianal area, there was no injury to the anus itself. The People insist the evidence is sufficient but do not explain how it satisfies the disputed element. As a matter of first impression, we conclude penetration of the perianal area is

5

sufficient to establish sexual penetration of the anal opening, and therefore, there is sufficient evidence to support the verdict.

### 1.1     Sexual Penetration by Object

A criminal defendant may not be convicted of a crime unless the prosecution proves every fact necessary for conviction beyond a reasonable doubt.  (U.S. Const., 5th Amend.; U.S. Const., 14th Amend.; see Cal. Const., art. I, §§ 7, 15; *In re Winship* (1970) 397 U.S. 358, 364 [90 S.Ct. 1068]; *Jackson v. Virginia* (1979) 443 U.S. 307, 316 [99 S.Ct. 2781].)  Criminal defendants are always "afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts."  (*United States v. Powell* (1984) 469 U.S. 57, 67 [105 S.Ct. 471].)

To convict a defendant of sexual penetration by object, the People must prove:

1.   defendant committed an act of sexual penetration with another person;

2.   the penetration was accomplished by using a foreign object;

3.   the other person did not consent to the act; and

4.   defendant accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to another person.

(§ 289, subd. (a)(1)(A); see CALCRIM No. 1045.)  " 'Sexual penetration' is the act of causing the penetration, however slight, of the genital or *anal opening* of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object."  (§ 289, subd. (k)(1) [emphasis added].)  The sexual penetration at issue in count 3 is penetration of the anal opening.

Defendant contends the plunger handle touched—but did not penetrate—B.'s anal opening.  But the distinction between touching and penetration depends in part on the definition of *anal opening*—and contrary to defendant's implication, that term is not synonymous with anus, either medically or legally.  We conclude object penetration requires something more than penetration of the buttocks (see *State v. A.M.*

(Wash.Ct.App. 2011) 163 Wash.App. 414 [penetration of buttocks not sufficient]), but does not require penetration past the anal verge or into the anal canal.

### 1.2    Anal Opening

The meaning of *anal opening* is a "question[] of statutory interpretation that we must consider de novo." (*People v. Prunty* (2015) 62 Cal.4th 59, 71.)  As with any case involving statutory interpretation, our primary goal is to ascertain and effectuate the lawmakers' intent.  (*People v. Park* (2013) 56 Cal.4th 782, 796.)  To determine intent, we first examine the statutory language and give the words their ordinary meaning. (*Ibid*.)  "Words and phrases must be construed according to the context and the approved usage of the language; but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in law, must be construed according to such peculiar and appropriate meaning."  (§ 7, subd. (16).)  If the statutory language is unambiguous, its plain meaning controls; if the statutory language is ambiguous, " ' "we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history."  [Citation.]  Ultimately we choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute. [Citations.]' " (*Mays v. City of Los Angeles* (2008) 43 Cal.4th 313, 321.)

The anus contains two sections—a mucosa-lined anal canal at the top and an epidermis-lined perianal margin at the bottom.  (Internat. Agency for Research on Cancer, World Health Organization Classification of Tumours.  Pathology and Genetics of Tumors of the Digestive System (Aaltonen & Hamilton edits., 2000)  Tumours of the Anal Canal, p. 147 (hereafter IARC).)  At the top, the rectum connects the large intestine to the anal canal.  (Taber's Cyclopedic Medical Dictionary (16th ed.1989) p. 1570.)  The anal verge connects the bottom of the anal canal to the anal margin. (Mills (3d ed. 2007) Histology for Pathologists, ch. 27, p. 664 (hereafter Mills) ["The anal verge can be defined as the point (line) where the walls of the anal canal come in contact in their normal resting state."]; Cal. Off. of Emergency Services, Cal. Medical Protocol for Examination of Sexual Assault and Child Sexual Abuse Victims (2001)

appen. N (hereafter OES, Medical Protocol) [defining *anal verge* as "the tissue overlying the subcutaneous external anal sphincter at the most distal portion of the anal canal (anoderm) and extends exteriorly to the margin of the anal skin."].) "The anal margin begins approximately at the anal verge . . . . It represents the transition from the squamous mucosa to the epidermis-lined perianal skin, and extends to the perianal skin." (Ryan & Willett (2011) Classification and Epidemiology of Anal Cancer, figure 1.) The "boundary [of the anal margin] is indistinct . . . , and anatomically, its location" varies by person. (American Joint Committee on Cancer (6th ed. 2002) Staging Manual, ch. 13, p. 125.)

"The perianal skin (the anal margin) is defined by the appearance of skin appendages." (IRAC, *supra*, at p. 147; see Mills, *supra*, at p. 670 ["At the lower border of the anal canal, the dull, wrinkled perianal skin with hair follicles is obvious"].) However, "[t]he perianal region is not well defined" (Mills, *supra*, p. 667), and "[t]here exists no generally accepted definition of its outer limit." (IRAC, *supra*, at p. 147; see OES, Medical Protocol, *supra*, at appen. M, p. 27 [defining *perianal skin folds* as "[w]rinkles or folds of the perianal skin radiating from the anus, which are created by the contraction of the external anal sphincter."].) Indeed, "much confusion continues about definitions and nomenclature" of these structures generally. (Mills, *supra*, p. 664; see, e.g., *id.* at p. 665 ["It would seem natural to start with a definition of the anal canal; but, because there are several definitions and new terms are still introduced, a description of the anatomical landmarks and epithelial zones may be the best introduction to this never-ending discussion."]; Rociu, et. al, *Normal Anal Sphincter Anatomy* (2000) 217 Radiology 395–401, 399 ["There have been many contradictory and often confusing theories of the anatomy of this region."].) It appears, therefore, that the terms anal verge, anal margin, perianal area, perianal folds, and perianal skin all describe at least part of the anal opening—the outer boundary of the anus.

Given that medical professionals cannot agree on what to call the areas between the rectum and the buttocks, it is not surprising that the courts—which until recently referred to sodomy in wholly euphemistic terms—have struggled as well. (See, e.g.,

*People v. Gann* (1968) 259 Cal.App.2d 706, 710 ["On account of the degrading nature of the crime of sodomy it is uniformly held that it is not necessary to describe the offense with the same particularity which is required in other crimes."], 712 ["the commonly understood meaning of the euphemism, 'infamous crime against nature,' in section 286 of the Penal Code, is sufficiently definite to apprise the public generally of the conduct which is prohibited thereby, *sic*, copulation per anum[.]"].)  In light of the terminological confusion, and because neither the courts nor medical professionals have defined *anal opening*, we turn to cases describing vaginal penetration for guidance.

### 1.3    Construction with Related Statutes

While we look first at the words of a statute, we do not consider statutory language in isolation; rather, we read the statute "as a whole, harmonizing the various elements by considering each clause and section in the context of the overall statutory framework." (*People v. Jenkins* (1995) 10 Cal.4th 234, 246.)  We construe all parts of a statute together, without according undue importance to a single or isolated portion. (*Cooley v. Superior Court* (2002) 29 Cal.4th 228.)  Where statutes are inconsistent, we attempt to provide a harmonious interpretation, and give effect to every provision, so that one section does not destroy another. (*People v. Jenkins*, *supra*, at p. 246; see 2A Sutherland Statutory Construction (7th ed., rev. Apr. 2014) § 46:6, pp. 238–252.)  Thus, " '[a] word or phrase will be given the same meaning each time it appears in a statute . . . . ' " (*Cooley v. Superior Court*, *supra*, at p. 255.)

"Preliminarily, we note that since its origin in 1872, the Penal Code has defined and prescribed punishment for the crimes of rape [citations] and sodomy [citations]. . . .  [¶]  However, before 1979, there was no felony proscription per se against nonconsensual contact with, or penetration of, another person's genitals or anus through the use of an instrument or body part other than the mouth or penis." (*People v. Harrison* (1989) 48 Cal.3d 321, 327–328 [footnotes omitted] (*Harrison*).)  Because section 289 was enacted to treat object penetration as an equally serious violation of personal integrity, it shares "a very close relationship" with the rape and sodomy statutes.  (*People v. Quintana* (2001) 89 Cal.App.4th 1362, 1369–1370; see *People v.*

9

*Martinez* (1986) 188 Cal.App.3d 19, 22–25 [discussing history of sodomy statute and its "integral relationship" with rape statute].)  In particular, the penetration element at issue here mirrors the language in the statutes governing rape and sodomy.  (*Harrison*, *supra*, at p. 328.)

The Penal Code defines sodomy as "sexual conduct consisting of contact between the penis of one person and the anus of another person.  Any sexual penetration, however slight, is sufficient to complete the crime of sodomy."  (§ 286, subd. (a).)  *Sexual penetration*, in turn, is penetration of the anal opening with the required intent.  (§ 289, subd. (k)(1).)  Taken together, the crime of sodomy requires the perpetrator to penetrate the anal opening *and* to make contact with the anus.  To give effect to both requirements, the anus must lie somewhere beyond the anal opening.  And, "in using identical words to define the analogous act in section 289, the Legislature undoubtedly intended to convey the same meaning."  (*Harrison*, *supra*, 48 Cal.3d at p. 329.)

Likewise, rape is nonconsensual "sexual intercourse."  (§ 261, subd. (a).)  In that context, sexual intercourse refers to vaginal penetration.  (*People v. Stitely* (2005) 35 Cal.4th 514, 554–555.)  Notwithstanding the term's apparent meaning, however, vaginal penetration does not require penetration of the vagina itself.  (*People v. Karsai* (1982) 131 Cal.App.3d 224, 232 (*Karsai*).)  Rather, "[p]enetration of the external genital organs is sufficient to constitute sexual penetration and to complete the crime of rape even if the rapist does not thereafter succeed in penetrating into the vagina."  (*Ibid.* [victim's testimony that defendant pushed his penis between the lips of her vagina was sufficient to support rape conviction]; see also *People v. Dunn* (2012) 205 Cal.App.4th 1086, 1097 [relying on *Karsai*, sexual intercourse required proof of "penetration of [the victim's] labia majora, not her vagina"]; CALCRIM No. 1000 ["Sexual intercourse means any penetration, no matter how slight, of the vagina or genitalia by the penis."].)[5]

---

[5]     *Karsai* was disapproved on other grounds in *People v. Jones* (1988) 46 Cal.3d 585, 600, fn. 8.  Fifteen years after *Karsai* held that the "penetration which is required is

The "essential guilt" of each of these crimes "consists in the outrage to the person and feelings of the victim." (§ 263.) Consequently, any sexual penetration, however slight, is sufficient to complete the crime of rape. (§ 263; *People v. Wallace* (2008) 44 Cal.4th 1032, 1079.) As noted above, it appears the perianal folds, which radiate from the anus, comprise the outer edge of the anus (OES, Medical Protocol, *supra*, at appen. M, p. 27); thus, the outer edge of the perianal area forms the edge of the anal opening. Yet even if the perianal area merely adjoins the anal opening, it is undoubtedly part of the external anal structure—just as the labia, though not part of the vagina, are part of the external genitalia. Defendant has provided us with no reason to treat the anus and the vagina differently.

We therefore conclude that sexual penetration requires penetration of the perianal area, but does not require penetration beyond the perianal folds or anal margin. With this definition in mind, we turn to the question before us—is the evidence sufficient to support the verdict? We conclude it is.

### 1.4 There was sufficient evidence defendant penetrated the anal opening.

In assessing the sufficiency of the evidence, we review the entire record to determine whether *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Ibid*.)

In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury

---

sexual penetration and not vaginal penetration[]" (*Karsai*, *supra*, 131 Cal.App.3d at p. 232), the California Supreme Court began defining rape's sexual intercourse element as "vaginal penetration." (*People v. Holt* (1997) 15 Cal.4th 619, 675–676.) While that construction casts some doubt on *Karsai*'s continued validity, the Court has never directly addressed *Karsai*'s holding, and courts continue to rely on it.

could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) The same standard applies where the conviction rests primarily on circumstantial evidence. (*People v. Thompson* (2010) 49 Cal.4th 79, 113.) We may not reweigh the evidence or resolve evidentiary conflicts. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Accordingly, we may not reverse for insufficient evidence unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

B. testified that defendant tried to insert the plunger handle near her "anal area" and "tried to insert it into my anal area." The plunger touched her "anal area . . . but it doesn't go inside." While the plunger did not penetrate the anus itself, however, it did touch "a portion of that area." Beukes, the sexual-assault nurse, testified that she observed tenderness and anal tears in the perianal area. Also entered into evidence were Beuke's report and a photograph of the plunger. Defendant contends this evidence, taken together, is insufficient to support the verdict. We disagree.

First, B. apparently used "anal area" and "anus" synonymously during her testimony. But the required penetration was of the anal opening, not the anus. Because the anus lies beyond the anal opening, when the plunger touched the anus, it necessarily penetrated the anal opening.

Second, Beukes's testimony,[6] examination report, and the plunger itself support a reasonable inference that the plunger handle penetrated the anal opening. Beukes testified that she observed tenderness and lacerations in B.'s perianal area. She

_____

[6]     We acknowledge Beukes's anatomical explanations were contradictory and confusing at times. For example, she testified first that the anal verge was both "part of the skin where it goes from the outer to the inner" and a structure inside the anus; she testified that the perianal area surrounds the anal area, then that the anus *is* the perianal area, then that the anus is different from the perianal area; and while Beukes mentioned the "anal area" several times, she never explained where the "anal area" begins and ends or how it relates to the anus. Nevertheless, the testimony does not support defendant's claim that the anal verge "is where the entry point to the anus actually starts."

documented the injuries using a modified, commercial version of the State's official sexual assault form.[7] The summary page asks whether visible findings were observed in three areas: the buttocks/perianal, the anus/verge, and the rectum. Beukes indicated she observed visible findings on "The Buttocks/Perianal" but not on "The Anus/Verge." However, on the relevant diagram, Beukes recorded two lacerations in the perianal folds, which she described as "ANAL @ 5:00 & 7:00." The diagram is a line drawing depicting the buttocks, anus, and anal opening. A large oval appears at the center and is surrounded by radiating lines forming a sunburst pattern. On the diagram, Beukes noted a laceration beginning at the edge of the radiating lines and continuing to the edge of the oval. Put another way, it depicts an injury to the anal margin or perineal folds—an injury sufficiently within the anal opening.

A photograph of the plunger provided additional support for the jury's verdict. The plunger's handle was 19 inches long and made of clear acrylic or resin. At the top of the handle are five contiguous plastic knobs, each with a one-inch diameter and a 3.14-inch circumference—like a string of large, inflexible beads. The jury could have reasonably concluded that friction from the side of one of these knobs produced the laceration Beukes saw, and that the tip of the handle penetrated beyond the end of the visible tear.

We conclude this evidence, taken together, was sufficient to support defendant's conviction for count 3.

### 2. The Instructional Error as to Counts 2 and 3

Defendant contends the court erred by instructing the jury that sexual penetration by object is a general-intent crime. The People concede most appellate opinions

---

[7] The Medical Protocol, which "contains recommended methods for meeting the minimum legal standards established . . . for performing evidential examinations," lists OCJP 923 as a required state form. (OES, Medical Protocol, *supra*, at pp. iii, 1–2 & appen. C.) We offer no opinion on whether use of a modified version of that form complies with state law. (See § 13823.5, subd. (c) [requiring every healthcare practitioner who conducts a medical examination of a sexual assault victim for evidence of sexual assault to use a standard form to record findings].)

13

conclude section 289 is a specific-intent crime, but nevertheless argue the jury was properly instructed because the trial court could have followed the one opinion that came out the other way. We conclude the court erred but also conclude the People have proven beyond a reasonable doubt that the error was harmless.

### 2.1     Proceedings Below

As relevant to the claimed error, the court instructed the jury in accordance with CALCRIM No. 1045 that sexual penetration by force requires the People to prove "[t]he defendant committed an act of sexual penetration with another person[.]"  The court then explained, "*Sexual penetration* means penetration, however slight, of the genital or anal opening of the other person . . . for the purpose of sexual abuse, arousal, or gratification. . . .  [¶]  Penetration for *sexual abuse* means penetration for the purpose of causing pain, injury, or discomfort."

The court also instructed the jury with CALCRIM No. 252, which described "unlawful sexual penetration with a foreign object as charged in Counts 2 and 3" as "general criminal intent" crimes, requiring that defendant must "not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act; however, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime or allegation."  (CALCRIM No. 252.)  The court went on to explain that count 6, assault with intent to commit sexual penetration by object, required specific intent.

### 2.2     Sexual penetration is a specific-intent crime.

Defendant contends that because sexual penetration is a specific-intent crime, it was error for the court to include counts 2 and 3 on the list of general-intent crimes. We agree. The crime of sexual penetration by object is a specific-intent crime because it requires the penetration "to be done with the intent to gain sexual arousal or gratification or to inflict abuse on the victim." (*People v. McCoy* (2013) 215 Cal.App.4th 1510, 1541 (*McCoy*); accord, *People v. ZarateCastillo* (2016) 244 Cal.App.4th 1161, 1167—1169; *People v. Ngo* (2014) 225 Cal.App.4th 126, 157 [§ 288.7, sexual penetration with a child, is a specific-intent crime]; *People v. Senior*

14

(1992) 3 Cal.App.4th 765, 776 ["specific intent involved in foreign object penetration is 'the purpose of sexual arousal, gratification, or abuse.' "].) Despite the broad agreement on this point, the People contend the instructions were proper because the court could have relied on *People v. Dillon*, which held sexual penetration by object is a general-intent crime. (*People v. Dillon* (2009) 174 Cal.App.4th 1367, 1380 (*Dillon*).)

It is hornbook law that the "[d]ecisions of every division of the District Courts of Appeal are binding upon all . . . the superior courts of this state" (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity Sales*)) and "must be applied wherever the facts of a case are not fairly distinguishable from the facts of the case in which we have declared the applicable principle of law." (*People v. Triggs* (1973) 8 Cal.3d 884, 891, disapproved on other grounds in *People v. Lilienthal* (1978) 22 Cal.3d 891, 896, fn. 4.) When appellate decisions conflict, "the court exercising inferior jurisdiction can and must make a choice between the conflicting opinions." (*Auto Equity Sales*, *supra,* at p. 456.) The People contend *Dillon* and *McCoy* are one such pair of conflicting opinions, and in light of this conflict, the court was entitled to follow *Dillon*. We disagree.

Like the two cases at issue in *Auto Equity Sales*, *Dillon* and *McCoy* "dealt with different problems, and are in no sense contrary to each other." (*Auto Equity Sales*, *supra*, 57 Cal.2d at p. 457.) *Dillon*, which addressed sexual penetration in the context of an assault charge, concerned the defendant's specific intent to act without the victim's consent. (*Dillon*, *supra*, 174 Cal.App.4th at p. 1378.) Significantly, because the parties in *Dillon* agreed section 289 was a general-intent crime, the court did not have occasion to consider the question in detail. (*Id.* at p. 1380; see *McCoy*, *supra*, 215 Cal.App.4th at p. 1537 [*Dillon* "only tangentially addresses whether the crime of unlawful sexual penetration is a specific or general intent crime"]; *Auto Equity Sales*, *supra*, at pp. 456-457 [noting the arguably-conflicting case was short and did not discuss the precise legal question at issue]; cf. *People v. McCarthy* (2016) 244 Cal.App.4th 1096, 1111 [where party in prior case conceded legal issue, court did not have occasion to consider merits and prior case is not authority for the conceded proposition].) *McCoy*,

15

on the other hand, analyzed section 289 and the relevant authority in detail—and its holding squarely addressed the question in this case: "the specific intent to gain sexual arousal or gratification or to inflict abuse on the victim." (*McCoy*, *supra*, at p. 1538.) In short, the facts and the issue presented in *Dillon* were "fairly distinguishable from the facts of" this case; those in *McCoy* were not. Accordingly, under *Auto Equity Sales*, the court was not entitled to disregard *McCoy* in favor of *Dillon*. (*Auto Equity Sales*, *supra*, at p. 456.)[8]

### 2.3 The instructional error was harmless beyond a reasonable doubt.

As discussed, "[t]he due process clause 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' [Citations.] Because due process principles require the prosecution to prove every element of the crime beyond a reasonable doubt, jury 'instructions *completely removing* the issue of intent from the jury's consideration may constitute a denial of federal due process.' [Citation.] Conflicting intent instructions— where one instruction requires the prosecution to prove intent while another instruction eliminates that requirement—can operate the same way. [Citation.] Accordingly, '[i]f conflicting instructions on the mental state element of an alleged offense can act to remove that element from the jury's consideration, the instructions constitute a denial of federal due process[.]' [Citation.] This is so even where the court's instructions on the offense itself correctly explain the required intent, because we have 'no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict.' [Citations.]" (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1164–1165 (*Valenti*).) In this case, we need not determine whether the instructions "effectively 'removed the mental state element' from the jury's consideration," however, because even if the

---

[8]    In any event, the court conducted the jury-instruction conference off the record, and there is no evidence the court actually relied on *Dillon*. (See *Auto Equity Sales*, *supra*, 57 Cal.2d at p. 456 [trial court cited conflicting opinion in passing].)

16

conflicting instructions amounted to a failure to instruct on an element of the offense, the error was harmless beyond a reasonable doubt. (*Id.* at p. 1165; see *People v. Haley* (2004) 34 Cal.4th 283, 314 [trial court's mistaken instruction that a crime required general, rather than specific, intent is federal constitutional error].)

"We assess federal constitutional errors under *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824] (*Chapman*). Under *Chapman*, we must reverse unless the People 'prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' (*Ibid*.) Where the trial court fails to instruct on an element of the charged offense, however, the People must make a more substantial showing. That showing is governed by *Neder v. United States* (1999) 527 U.S. 1, 17–19 [119 S.Ct. 1827] (*Neder*), and by the California Supreme Court's decision interpreting *Neder*, *People v. Mil* [(2012)] 53 Cal.4th 400 [(*Mil*)] . . . .

" '*Neder* instructs us to "conduct a thorough examination of the record. If, at the end of that examination [we] cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—[we] should not find the error harmless." ' (*Mil*, *supra*, 53 Cal.4th at p. 417, quoting *Neder*, *supra*, 527 U.S. at p. 19.) On the other hand, the error is harmless if the People can prove beyond a reasonable doubt that the omitted element was uncontested and supported by such overwhelming evidence that no rational juror could come to a different conclusion. [Citations.]" (*Valenti*, *supra*, 243 Cal.App.4th at pp. 1165-1166.)

Noting that sexual penetration required him to act "for the purpose of sexual abuse, arousal, or gratification[,]" defendant contends "the assaults, particularly the acts of attempted or actual penetration with a foreign object, were very violent and the jury could as well have found those charges were committed for sadistic, rather than sexual purposes." Be that as it may, penetration "for the purpose of sexual abuse[]" does not require sexual intent. (*People v. White* (1986) 179 Cal.App.3d 193, 204–206.) "Penetration for *sexual abuse* means penetration for the purpose of causing pain, injury,

17

or discomfort." (CALCRIM No. 1045.) "The term 'abuse' imports an intent to injure or hurt badly, not lewdness. . . . [I]t is the nature of the act that renders the abuse 'sexual' and not the motivations of the perpetrator." (*People v. White*, *supra*, at pp. 205–206.) The evidence established defendant grabbed B. by the hair, pushed his fingers into her vagina with enough force to lift her off the ground, repeatedly punched her in the head and slammed her head against a metal paper towel dispenser, skewered her with a plunger handle, stuffed his shirt into her mouth, and used his shirt to choke her. The evidence that defendant acted with the "intent to injure or hurt badly[]" was overwhelming. Accordingly, defendant's interpretation satisfies the disputed element. In any event, as the People argue, there was also ample evidence that defendant acted "for the purpose of sexual . . . arousal, [or] gratification." (§ 289, subd. (k).) B.'s testimony and the DNA evidence both established that upon completion of the attack, defendant masturbated and ejaculated into the nearby toilet. This act alone provides strong evidence of sexual arousal or gratification.

We have thoroughly examined the record before us and conclude it contains no "evidence that could rationally lead to a contrary finding" on the intent element. (*Neder*, *supra*, 527 U.S. at p. 19.) Accordingly, the People have carried their burden.

### 3. Defendant's sentence is proper.

Defendant contends the court erred by imposing consecutive one-strike sentences for counts 1, 2, 3 and 5. Because the attacks "constituted one continuous assault," he argues, there was insufficient evidence the crimes occurred on "separate occasions." (§ 667.61, subds. (a), (d)(2), (i); § 667.6, subd. (d).) Crimes occur on separate occasions if, "between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior." (§ 667.6, subd. (d).) The People contend defendant's sentence is proper because he "unquestionably had a reasonable opportunity to reflect upon his actions, chose not to do so, and instead resumed" his attack on B. We agree with the People.

### 3.1 Statutory Scheme

Under certain aggravating circumstances, the One Strike Law (§ 667.61) requires courts to impose longer sentences on defendants who commit violent sex crimes like rape (§ 261; counts 1 and 5) and sexual penetration by object (§ 289, subd. (a)(1)(A); counts 2 and 3). (§ 667.61, subd. (c).) As relevant to this case, when a defendant is convicted of a sex offense listed in subdivision (c) *and* an aggravating factor listed in subdivision (d), subdivision (a) requires the court to sentence him to an indeterminate term of 25 years to life. (§ 667.61, subds. (a), (c), (d).) Because the jury in this case found the aggravated-kidnapping allegation (§ 667.61, subd. (d)(2)) true for counts 1, 2, 3, and 5, the court was required to sentence defendant to an indeterminate one-strike term for each count. (*People v. Rodriguez* (2012) 207 Cal.App.4th 204, 213 (*Rodriguez*).)

Once it determines the Law applies, the trial court must decide whether to impose concurrent or consecutive one-strike sentences. While that choice is sometimes discretionary, the court *must* impose consecutive sentences "if the crimes involve separate victims or involve the same victim on separate occasions as defined in subdivision (d) of Section 667.6." (§ 667.61, subd. (i).) "In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a *reasonable opportunity to reflect* upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative of the issue of whether the crimes in question occurred on separate occasions." (§ 667.6, subd. (d), emphasis added.)

The parties agree on this much. However, they disagree on whether the offenses in this case were committed on separate occasions—and therefore, whether defendant was properly sentenced to consecutive, rather than concurrent, indeterminate terms.

### 3.2    Separate Occasions

"Separate occasions" need only be established by a preponderance of the evidence. (*People v. Groves* (2003) 107 Cal.App.4th 1227, 1231–1232.) Accordingly, "[o]nce a trial judge has found under section 667.6, subdivision (d), that a defendant committed offenses on separate occasions, we may reverse only if no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior." (*People v. Garza* (2003) 107 Cal.App.4th 1081, 1092 (*Garza*).)

There is no bright line rule for evaluating whether violent sex crimes occurred on separate occasions. "[A] forcible violent sexual assault made up of varied types of sex acts committed over time against a victim, is not necessarily one sexual encounter." (*People v. Irvin* (1996) 43 Cal.App.4th 1063, 1071.) Thus, a finding that the defendant committed sex crimes on separate occasions "does not require a change in location or an obvious break in the perpetrator's behavior." (*People v. Jones* (2001) 25 Cal.4th 98, 104 (*Jones*), superseded by statute on other grounds as stated in *Rodriguez*, *supra*, 207 Cal.App.4th at p. 213.) Instead, the statutory issue is whether "the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior." (§ 667.6, subd. (d); see *Jones*, at pp. 103—106.)

Thus, in *Garza*, the appellate court affirmed the finding of separate occasions where, between acts of forcible oral copulation and rape, the defendant released the victim's neck, ordered her to strip, punched her in the eye, put his gun to her head, threatened to shoot her, and removed his own clothes. (*Garza*, *supra*, 107 Cal.App.4th at p. 1092.) The court also concluded the defendant had an adequate opportunity to reflect upon his actions when, between acts of digital penetration and rape, the defendant played with the victim's chest, put his gun down, pulled the victim's legs around his shoulders, and began forcible intercourse with her. (*Id*. at pp. 1092–1093.) Although the sex acts occurred in one place and without much of a break between acts, the court reasoned the "sequence of events afforded [the defendant] ample opportunity to reflect on his actions and stop his sexual assault, but he nevertheless resumed it." (*Id*. at p. 1092.)

Similarly, in *People v. King*, our colleagues in Division One addressed a case concerning a police officer who sexually assaulted a victim during a purported traffic stop. (*People v. King* (2010) 183 Cal.App.4th 1281, 1286–1287.) Though the attacks took no more than two minutes (*id.* at p. 1324), the evidence supported the separate-occasion finding. After a first act of digital penetration, the defendant saw lights and a car driving past, at which point he paused, looked around uneasily, then used his other hand to digitally penetrate the victim again. (*Id.* at pp. 1287–1291.) This evidence was sufficient for a reasonable trier of fact to conclude the defendant had a reasonable opportunity to reflect before resuming his assaultive behavior. (*Id.* at pp. 1325–1326.)

Relying on *People v. Corona* and *People v. Pena*, defendant argues there is insufficient evidence to support such a finding in this case because the varied attacks "constituted one continuous assault." (See *People v. Corona* (1988) 206 Cal.App.3d 13 (*Corona*); *People v. Pena* (1992) 7 Cal.App.4th 1294 (*Pena*).) As a preliminary matter, the California Supreme Court has criticized *Corona* and *Pena*, both of which involved earlier versions of section 667.6. (*Jones*, *supra*, 25 Cal.4th at pp. 104–105, 114.) In any event, we find those cases unpersuasive. In *Corona*, the prosecutor took the position there were only two episodes of sex offenses, stating, " 'it is difficult to argue that the oral copulation and foreign object rape, occurring just prior to the rapes, are themselves separate episodes.' " (*Corona*, *supra*, at p. 16.) Apparently accepting that concession, the *Corona* court upheld the imposition of consecutive sentences on two "separate occasions" under subdivision (d). Since the People did not dispute the defendant's argument on that issue, the *Corona* court had no occasion to consider just how much opportunity for reflection was required. *Pena*, in turn, relies heavily on *Corona*. (*Pena*, *supra*, 7 Cal.App.4th at p. 1314.) But since *Corona* did not have occasion to resolve the central issue before us, that reliance appears to be unwarranted. Here, there is no concession from the prosecutor. And unlike *Corona* and *Pena*, which were decided more than 20 years ago, we have the benefit of the Supreme Court's 2001 analysis in *Jones* and the subsequent appellate opinions that have applied it.

21

### 3.3 The court's conclusion was reasonable.

We agree with the People, and with the court below, that defendant "unquestionably had a reasonable opportunity to reflect upon his actions, chose not to do so, and instead resumed" his attack on B. As the court explained in detail, after dragging B. to the bathroom by her hair, defendant pressed her against the wall and inserted his fingers into her vagina. After completing that act, defendant punched B. in the face, then unzipped his pants, removed his penis, and raped her. Next, defendant removed his penis from B.'s vagina, seized a nearby toilet plunger, and inserted it into B.'s anal opening. When that did not work as he had hoped, defendant discarded the plunger and raped B. again. When he was done, defendant removed his penis from B.'s vagina and ejaculated into the toilet. Unlike in *Pena*, defendant did not accomplish these acts in a matter of seconds (see *Pena*, *supra*, 7 Cal.App.4th at p. 1316); instead, the ordeal lasted approximately 13 minutes.

The court conducted a lengthy, detailed examination of these facts, and came to the following conclusions. "There was nothing seamless about what [defendant] did. There was nothing seamless in terms of this sort of rolling from one action to another." As reflected in the audio and video recordings, defendant's sequential attacks were "punctuated by continuous screams. It was punctuated by [B.'s] attempts to tell him no and screaming no, attempting to negotiate with him, and his responses were threats and a continuation of his brutality." "He's also threatening her as she is protesting. And that's his response. And then over her protestations, which is an opportunity to weigh, 'Well, do I want to continue on with this?' she is telling him, 'No. No.' His response is not to ignore her, but simply telling her—threatening her even more. He says, 'I'm going to continue with this.'" "The victim's actions required a reaction from the defendant, a reassessment of what he was doing or about to do, and he took appropriate actions that he thought necessary to carry out each of his crimes."

"For whatever period of time he was doing it, he decides, 'What else is in the bathroom?' And sees a plunger next to the toilet where he, basically, has her probably pinned close to or near to. 'Oh, what's that object? It's a plunger,' he says. It's for

bathrooms, you know, to unclog a toilet.  He must have looked at it as—the handle as it could be used for something else other than a handle to be used to unclog a toilet.  'Ah, a handle, a pole.  Let's see if I can get that into her anus.'  That will fit.  Sounds like an opportunity to reflect to me."  The court continued, "I believe the use of the plunger itself and how it was used shows and a reflective aspect in terms of as an object that you can use for something other than its intended purpose, but an opportunity to further penetrate the two orifices of the victim, which are her anus and her vagina."  The court reasoned, "When you go from one act to another act to another act in the manner in which he did and with the objects in which he did and the body parts in which he did, in the court's mind, that's not only an opportunity to reflect, but is part of, you know, an overall, 'well, let me try this.' "

Again noting the substantial length of the attacks, the court concluded, "The nature of the crimes and the sequence of events, the court finds a single circumstance with not only an actual opportunity to reflect upon, but the court believes that he, in fact, engaged in reflection in terms of what the next act was going to be and that, over the victim's protestations, continued onward in accomplishing each of the separate acts."  We agree.

### 4.       Fines and Penalty Assessments

"In passing sentence, the court has a duty to determine and impose the punishment prescribed by law."  (*People v. Cattaneo* (1990) 217 Cal.App.3d 1577, 1589.)  An unauthorized sentence may be challenged "for the first time on appeal, and is subject to judicial correction whenever the error comes to the attention of the reviewing court."  (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6.)

### 4.1      Sex Offender Fine

Effective September 20, 2006, section 290.3, subdivision (a) provides for sex-offense fines of $300 "upon the first conviction" and $500 "upon the second and each subsequent conviction."  (Stats. 2006, ch. 337, § 18, p. 2610.)  Because defendant was convicted of four counts subject to this fine, he had one qualifying first conviction and three qualifying second and subsequent convictions.  (*People v. O'Neal* (2004)

23

122 Cal.App.4th 817, 822; see *People v. Walz* (2008) 160 Cal.App.4th 1364, 1371 (*Walz*).) Therefore, defendant was eligible for one $300 fine for count 1, and up to three fines of $500 each for counts 2, 3, and 5. (*Ibid.*) Put another way, the court could have imposed fines totaling $300, $800, $1300 or $1800. (*Walz*, *supra*, 160 Cal.App.4th at pp. 1369–1371 [must impose fine in statutory amount or not at all].)

The court in this case imposed a $500 fine on count 1—an amount unauthorized by statute. We therefore reduce the count 1 fine to $300, an amount authorized by statute. (*People v. Valenzuela* (2009) 172 Cal.App.4th 1246, 1249–1250.)

The court's unexplained failure to impose the fine on counts 2, 3, and 5 is not jurisdictional error. (*Walz*, *supra*, 160 Cal.App.4th at p. 1371.) The People did not object to the failure to impose the fines, and on this silent record, we presume the court determined defendant did not have the ability to pay the additional fines. (*People v. Tillman* (2000) 22 Cal.4th 300, 301–302 [People's failure to object forfeits assertion that trial court erred in making discretionary choice not to impose fines]; *People v. Stewart* (2004) 117 Cal.App.4th 907, 911 [on silent record, failure to impose sex offender fine implies finding that defendant does not have the ability to pay].)

### 4.2 Penalty Assessments

The sex offender fine is subject to seven additional assessments, penalties, and a surcharge—collectively called penalty assessments. (*People v. Sharret* (2011) 191 Cal.App.4th 859, 864 (*Sharret*).) "In Los Angeles County, trial courts frequently orally impose [these] penalties and surcharge . . . by a shorthand reference to 'penalty assessments.' " (*Ibid.*) While the *Sharret* court approved this practice, it cautioned that the "trial court clerk [must] specify the penalties and surcharge in appropriate amounts in the minutes and, more importantly, the abstract of judgment." (*Ibid.*) That is, the abstract of judgment must **separately list** "the amount and statutory basis for each base fine and the amount and statutory basis for each penalty assessment[.]" (*People v. Hamed* (2013) 221 Cal.App.4th 928, 940.) The abstract of judgment in this case is insufficient; it simply says, "Defendant ordered to pay $2,050 pursuant to 290.3 PC." It does not mention penalty assessments at all. The minute order is not much clearer. It

24

says, "the defendant is ordered to pay a sexual habitual offender fine of $500.00 pursuant to Penal Code section 290.3, said fine is to include a surcharge of $100.00 and penalty assessments in the amount of $1450.00, for a total due of $2050.00."

The judgment here must be modified because the court imposed a fine in an amount unauthorized by section 290.3 and failed to specify how it arrived at the $1,450 in penalty assessments. "Since we may correct the error on appeal, there is no need to remand this matter to the sentencing court to orally pronounce the correct judgment. We will therefore direct the trial court clerk to prepare an amended abstract of judgment" listing "the amounts of and statutory basis for the base fine and each of the penalty assessments that we order in this case." (*People v. Hamed*, *supra*, 221 Cal.App.4th at p. 940.) " '[T]he trial court is to actively and personally insure the clerk accurately prepares a correct amended abstract of judgment.' " (*People v. Johnson* (2015) 234 Cal.App.4th 1432, 1459.)

### 4.3 Amount of Base Fine and Penalty Assessments

As discussed, the correct amount of the section 290.3 base fine was $300 for a first offense. This $300 base fine was subject to the following penalty assessments: (1) a 100 percent state penalty assessment (§ 1464, subd. (a)(1)) equal to $300; (2) a 20 percent state criminal surcharge (§ 1465.7) equal to $60; (3) a 50 percent county assessment (Gov. Code, § 76000, subds. (a)(1), (e)) equal to $150; (4) a 30 percent court construction penalty (Gov. Code, § 70372) equal to $90 (see *People v. McCoy* (2007) 156 Cal.App.4th 1246, 1249 [penalty in Los Angeles is $3 for every $10 or part of $10]); (5) a 20 percent emergency medical services penalty (Gov. Code, § 76000.5) equal to $60; (6) a 10 percent DNA penalty (Gov. Code, § 76104.6, subd. (a)(1)) equal to $30; and (7) a 40 percent state-only DNA penalty (Gov. Code, § 76104.7) equal to $120. Thus, the correct amount of the penalty assessments is $810.

### DISPOSITION

The judgment is modified to reduce the sex offender fine (Pen. Code, § 290.3) to $300. In addition, defendant is ordered to pay the following penalty assessments: (1) a $300 state penalty assessment (Pen. Code, § 1464, subd. (a)(1)); (2) a $60 state

criminal surcharge (Pen. Code, § 1465.7); (3) a $150 county assessment (Gov. Code, § 76000, subd. (a)(1)); (4) a $90 court construction penalty (Gov. Code, § 70372); (5) a $60 emergency medical services penalty (Gov. Code, § 76000.5); (6) a $30 DNA penalty (Gov. Code, § 76104.6, subd. (a)(1)); and (7) a $120 state-only DNA penalty (Gov. Code, § 76104.7).  The total amount of penalty assessments on the sex offender fine is $810.  In all other respects, the judgment is affirmed as modified.

The clerk of the trial court is directed to prepare an amended abstract of judgment indicating the amount of and statutory basis for the sex offender fine and the amount of and statutory basis for each penalty assessment and surcharge set forth above, and to send a copy of the amended abstract to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.                                    ALDRICH, J.

26